[No. H002714. Sixth Dist. Oct. 5, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
BENNY BAUTISTA OLIVENCIA et al., Defendants and Appellants.

## COUNSEL

Joan Isserlis, Rosemary S. Morrison, Dallas Sacher and Michael A. Kresser, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, David Salmon, Martin S. Kaye and Joyce Hee, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**AGLIANO, P.J.**—Benny Olivencia and his brother, Paul Olivencia, were tried together before a jury and were each convicted of one count of false imprisonment, a felony (Pen. Code, §§ 236, 237)[1] with the use of a knife (§ 12022, subd. (b)). Both were acquitted of first degree burglary (§§ 459,

---

[1] Subsequent statutory references are to the Penal Code unless otherwise noted.

460). Benny was sentenced to three years in state prison and Paul was sentenced to two years. Appellants contend the trial court erred in failing to instruct the jury that felony false imprisonment is a specific intent crime. Paul contends the trial court failed to hold a requested *Marsden* hearing (*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]), and improperly admitted a hearsay statement of Benny as the statement of a coconspirator (Evid. Code, § 1223). Benny contends the prosecutor improperly questioned him concerning his prior arrests, and the court erroneously allowed the prosecution to impeach him with a prior felony conviction for burglary.

## FACTS

Benny and Paul were "burned" in a drug transaction after Paul arranged to purchase cocaine from Mark Frates and George Walker at Frates's San Jose apartment. Paul gave Walker $380 for a package which allegedly contained that drug. Paul showed Benny what he had purchased, while Walker drove away. Benny and Paul immediately discovered they had been given something other than cocaine,[2] and chased Walker in their car but were unable to catch him.

About 7 or 8 o'clock that evening, Frates's 16-year-old girlfriend, Lori Ceballos, was home with their new baby. Lori heard a commotion outside. Shortly afterwards, Benny opened the door and walked into the apartment followed by Paul. Benny asked Lori where Frates was. Lori told the intruders to get out, but they refused. Benny said he was going to find Frates and kill him because Frates owed him money. Benny then unplugged the telephone and told Lori not to leave.

After about 10 minutes Benny left the apartment. As he did so, he told Paul to stay with Lori.

Between 8 and 9 o'clock Benny went to the apartment George Walker shared with his girlfriend, Rachael Rock. Frates and Walker were in the apartment when Benny arrived. Rachael answered the door. Benny asked if Rachael knew whom the car downstairs belonged to, referring to George Walker's car. Rachael said she didn't know. Benny said Frates and Walker had sold him aspirin and he wanted his money back and that "they" had Lori and the baby in "possession" and that "drastic things would happen" if the money wasn't returned. Benny then went downstairs and removed everything from the glove compartment of Walker's car.

---

[2] George Walker described the substance sold as "pharmaceutical synthetic cocaine."

Benny returned to Lori's apartment about one-half hour after he had left. This time, he was armed with a knife. Benny waved the knife around, stuck it into a coffee table, and told Lori he was going to stay there and wait for Frates "and if he got tired of waiting he was going to make [her] watch him cut up [her] baby." He also used his fist to punch a hole in a glass terrarium. After about five minutes, Benny left, saying he would be back. Lori testified Paul was not armed with a knife while he was at the apartment, although he did use a steak knife to cut tape to repair the terrarium Benny had broken.

Later that evening Walker went to the apartment where Benny and Paul were living to return the $120 he had received for his part in the bogus drug deal. He left the money at the house, and, as he was leaving, Benny arrived. He told Benny he had returned his share of the money and Benny said "Well, go talk to Paul, he's over there holding Lori and the baby."

Walker then flagged down San Jose Police Officer Richard Torres and asked the officer to go to Lori's apartment to investigate the false imprisonment of Lori and her baby.

Officer Torres went to Lori's apartment and knocked six or seven times while announcing he was a police officer. Eventually, after Torres threatened to kick the door down, Paul let him in.

Lori was sitting on the couch holding her baby. Torres saw a steak knife with a bandana wrapped around its handle on the floor next to a reclining chair; the chair, which was made of leather or vinyl, had a fresh imprint on the fabric as if someone had just gotten up from it. Lori told him Paul had been carrying the knife around the apartment.

Because Lori's testimony at trial tended to indicate Paul was not an active participant in the false imprisonment, but instead was attempting to calm Benny down, the prosecution introduced a tape recording of a previous phone interview with Lori to impeach her testimony at trial. In that interview, Lori stated that "they [Benny and Paul] just barged in . . . [a]nd they got a knife out of my kitchen drawer, locked my doors, unplugged my phone and said they were going to wait here until my boyfriend arrived with the money and if they got bored while they were waiting they were going to make me watch them kill my baby." When asked what Paul did during the crime, Lori responded: "Well, he would sit there. . . . [H]e's the one who got a knife out of my kitchen drawer and sat in my chair with a kitchen knife." In the taped interview, she said that Paul didn't want Benny to hurt her or her baby, but he was nevertheless keeping her there and she was afraid to leave the apartment even when she was left alone with Paul.

*Defense*

Paul called Lori as his only defense witness. She testified that Mark and George were nearby during the phone interview and that they persuaded her to say "less favorable" things about Paul because they were afraid he would be released and "get them." She reiterated that Paul tried to calm Benny down, that he only used the knife to fix her terrarium, and that she asked him to stay with her to protect her from Benny. She indicated she was never afraid of Paul and he never prevented her from leaving.

Benny testified in his own behalf. He stated he was on prescribed medication for a serious mental illness and that he had run out of the medication a couple of days before this incident. He testified he didn't remember any details of the day the false imprisonment occurred.

Two psychiatrists were called in Benny's behalf. Both believed Benny had suffered from schizophrenia for some years.

## DISCUSSION

### I. *Felony False Imprisonment Is a General Intent Crime*

Defendants contend the trial court had a duty to instruct that felony false imprisonment is a specific intent crime. Benny also contends the court had a duty to instruct the jury that his mental illness could be considered in determining whether he formed the necessary specific intent for felony false imprisonment. We conclude false imprisonment, whether misdemeanor or felony, is a general intent crime, and consequently find no instructional error.

In *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370], Chief Justice Traynor stated what has become the accepted test for distinguishing between specific and general intent crimes: "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*Id.* at pp. 456-457; accord: *People* v. *McDaniel* (1979) 24 Cal.3d 661, 669 [156 Cal.Rptr. 865, 597 P.2d 124]; *People* v. *Daniels* (1975) 14 Cal.3d 857, 860 [122 Cal.Rptr. 872, 537 P.2d 1232]; *People* v. *Simpson* (1987) 192 Cal.App.3d 1360, 1366 [237 Cal.Rptr. 910].)

False imprisonment is defined as "the unlawful violation of the personal liberty of another." (§ 236.) "If such false imprisonment [is] effected by violence, menace, fraud, or deceit . . ." the crime is a felony. (§ 237.)

In *People* v. *Swanson* (1983) 142 Cal.App.3d 104, 109 [190 Cal.Rptr. 768], the court held that false imprisonment is a general intent crime. The *Swanson* court did not specify whether the conviction in that case was a felony or a misdemeanor, although the circumstances of the offense and punishment indicate it was a felony. (*Id.* at p. 106.) The court reasoned that "section 236 defines false imprisonment as the 'unlawful violation of the personal liberty of another.' The definition of this criminal offense includes only a description of the particular act without any reference to an intent to do a further act or achieve a further consequence. Thus, it is a general intent crime." (*Id.* at p. 109.)

Defendants contend that only *misdemeanor* false imprisonment is a general intent crime under the *Hood* test. They argue felony false imprisonment is a specific intent crime since it requires a factor not present in misdemeanor false imprisonment: namely, that the crime "be effected by violence, menace, fraud, or deceit." (§ 237.)

As we understand defendants' argument, it is that in felony false imprisonment the perpetrator must engage in violence, menace, fraud or deceit *with the specific intent* to cause the unlawful violation of the personal liberty of another.[3] In making this argument, however, the defendants misconstrue the statutory definition of the crime. The statute neither expressly nor by necessary implication defines felony false imprisonment as an act of violence, menace, fraud or deceit performed with the intent to unlawfully violate the personal liberty of another. Rather, felony false imprisonment is punished more severely than misdemeanor false imprisonment *because of the aggravated manner* in which the false imprisonment is effected.

The defendants cite *People* v. *Hesslink* (1985) 167 Cal.App.3d 781 [213 Cal.Rptr. 465] in support of their argument. In *Hesslink,* the court held that extortion is a specific intent crime because it in essence proscribed the wrongful use of force or fear with the specific intent of inducing the victim to consent to the defendant's obtaining his or her property. (*Id.* at p. 789.) We do not take issue with *Hesslink.* That case construed a different statute whose gravamen was the use of force or fear to achieve a certain objective

---

[3]Benny also contends that fraud and deceit may themselves require a specific intent, whether or not felony false imprisonment requires a specific intent in all circumstances. We note the evidence here would only support a finding of violence or menace and that there is no evidence of fraud or deceit in this case. Consequently, the argument is irrelevant to the present case and we express no opinion concerning it.

(§ 518). Here, instead, we deal with a statute which simply prohibits the unauthorized violation of another's personal liberty. No specific state of mind is required.

Finally, defendants cite *People* v. *Haney* (1977) 75 Cal.App.3d 308 [142 Cal.Rptr. 186], which states that in order to establish any false imprisonment (felony or misdemeanor) "The acts must be done, the words must be said, with the intent of causing the confinement." (*Id.* at p. 313.) Admittedly, this characterization of the offense suggests it is a specific intent crime since it refers to an "additional consequence" the perpetrator intends to achieve.

However, the *Haney* court's concern was the substantial failure of the trial court to instruct the jury as to the elements of false imprisonment. (75 Cal.App.3d at pp. 310-311.) The precise nature of the requisite criminal intent—whether general or specific—was not an issue before the court. Consequently, any statements in *Haney* which can be read to indicate false imprisonment is a specific intent crime are merely dicta.

Moreover, we believe *Haney* misread the pertinent authority when it flatly stated that the acts must be done with the intent of causing the confinement. In making this statement *Haney* relied on *People* v. *Agnew* (1940) 16 Cal.2d 655 [107 P.2d 601]. The question in *Agnew* was whether the defendant could be found guilty of false imprisonment where he caused others (police officers) to restrain the victim. (16 Cal.2d at p. 659.) In this context, the Supreme Court quoted American Jurisprudence for the proposition that " '[i]f an act is done with the intention of causing the confinement of the person actually confined or of another and such act is a substantial factor in bringing about a confinement, it is immaterial whether the act directly or indirectly causes the confinement.' " (*Agnew, supra,* 16 Cal.2d at p. 660; see also *Griffin* v. *Clark* (1935) 55 Idaho 364 [42 P.2d 297, 301].) Given *Agnew's* factual context, this statement means at most that an intent to confine is required where the defendant *indirectly* causes the confinement. It has no application where, as in this case, the defendants have directly caused the confinement of the victim. (See *People* v. *Zilbauer* (1955) 44 Cal.2d 43, 51 [279 P.2d 534] where, in a "direct" confinement case, the court quoted *Agnew* for the definition of false imprisonment, but omitted the language regarding intent.)

In our view, neither *Haney* nor *Agnew* provide persuasive support for the argument that false imprisonment is a specific intent crime. We conclude that felony false imprisonment requires only general criminal intent; that is, the defendant must intend to commit an act, the natural, probable and foreseeable consequence of which is the nonconsensual confinement of an-

other person (*People v. Swanson, supra,* 142 Cal.App.3d at p. 110; *People v. McCree* (1954) 128 Cal.App.2d 196, 202 [275 P.2d 95]); or, to put it another way, false imprisonment requires only the "wrongful intent" to commit the forbidden act. (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1140 [222 Cal.Rptr. 630]; *People v. Mayberry* (1975) 15 Cal.3d 143, 154 [125 Cal.Rptr. 745, 542 P.2d 1337].)

Since we conclude that felony false imprisonment is a general intent crime, we find no instructional error.

## II. *Paul's Additional Contentions*

### A. *Marsden Issue*

 Paul next contends his conviction must be reversed because the trial court failed to hold a requested "*Marsden*" hearing. (*People v. Marsden, supra,* 2 Cal.3d at p. 118 [84 Cal.Rptr. 156, 465 P.2d 44].) Paul filed a written notice which specifically cited the *Marsden* case and requested that a "Marsden hearing be held before any other pretrial hearing . . . ." The notice stated that "the motion will be made orally by the defendant stating the grounds for the motion at this [*sic*] time." The court apparently overlooked this notice and a *Marsden* hearing was never held.

The People concede the *Marsden* error, but argue that an unconditional reversal of Paul's conviction is unwarranted; instead, they contend the appropriate remedy is to remand the case to the trial court to allow it to conduct a posttrial *Marsden* hearing. As we explain, we conclude the limited remand remedy is appropriate in this case.

 *Marsden* holds that the trial court must afford the defendant an opportunity to express the specific reasons why he believes he is not being adequately represented by his current counsel when he makes a request for the appointment of new counsel. (*People v. Marsden, supra,* 2 Cal.3d at pp. 123-124.) Originally, *Marsden* error was typically treated as prejudicial per se, since the very nature of the error—failing to allow a defendant to express his reasons for requesting new counsel—precludes meaningful appellate review. (*Id.* at p. 126; *People v. Hidalgo* (1978) 22 Cal.3d 826, 827 [150 Cal.Rptr. 788, 587 P.2d 230]; *People v. Hill* (1983) 148 Cal.App.3d 744, 755 [196 Cal.Rptr. 382].)

Subsequently, however, Division Four of the First District Court of Appeal adopted an alternative to outright reversal for *Marsden* error. In *People v. Minor* (1980) 104 Cal.App.3d 194 [163 Cal.Rptr. 501], the court reasoned that "Where the record on appeal discloses trial error affecting the

fairness and reliability of the guilt determination process, the normal reme-
dy is outright reversal . . . . But when the trial is free of prejudicial error
and the appeal prevails on a challenge which establishes only the existence
of an unresolved question which may or may not vitiate the judgment,
appellate courts have, in several instances, directed the trial court to take
evidence, resolve the pending question, and take further proceedings giving
effect to the determination thus made." (*Id.* at p. 199.) Relying on this line
of cases, the *Minor* court reversed for *Marsden* error, but directed the trial
court to conduct a posttrial *Marsden* hearing. The appellate court directed
the trial court to order a new trial if it determined that good cause for
appointment of new counsel had been shown, or to reinstate the verdict if it
found that good cause had not been established. (*Id.* at p. 200.) The *Minor*
remedy for *Marsden* error has been cited with approval by the Supreme
Court (*People v. Hall* (1983) 35 Cal.3d 161, 170 [197 Cal.Rptr. 71, 672 P.2d
854]) and has been followed by the Fifth District in *People v. Maese* (1985)
168 Cal.App.3d 803, 808-810 [214 Cal.Rptr. 365].

We believe the *Minor* remedy is appropriate in this case. We reject
Paul's contention that it would be unjust to conduct a *Marsden* hearing on
remand because the passage of time and subsequent events have blurred the
memories of those involved in the case. There is no indication that there is
any greater danger of that occurring in this case than there was in *Minor*.
(See also *People v. Maese, supra,* 168 Cal.App.3d at pp. 808-809.) We also
reject Paul's attempt to distinguish *Minor* on the ground that there is evi-
dence in this record of defense counsel's incompetence while in *Minor*
"there [was] no indication in the record of inadequacy on the part of trial
counsel." (104 Cal.App.3d at p. 200.) Paul claims the record shows his trial
counsel was inadequate because counsel informed the trial court in a pretri-
al *Castro* motion that Paul would be called to the stand, but in fact Paul did
not testify at trial. Paul also claims an on-the-record discussion in which he
sought to obtain a tape recording of his parole revocation hearing showed
that counsel was inadequate because *counsel* should have obtained that
transcript. These claims are specious and deserve no further comment.
There is no evidence in the record that Paul's counsel was inadequate.

The judgment with respect to Paul must be reversed and the trial court is
directed to conduct a hearing at which Paul shall be afforded an opportuni-
ty to state the reasons he desired the appointment of new counsel. The court
shall determine the application for new counsel in light of *People v. Mars-
den*. Since this hearing will be in the nature of a motion for new trial, the
trial court shall have discretion to consider Paul's complaint in light of the
manner in which his counsel actually performed at trial. If the court deter-
mines that good cause for appointment of new counsel has been shown, the
court shall appoint new counsel and set the case for retrial. If the court

determines that good cause has not been shown, it shall reinstate the verdicts and judgment against Paul.

## B. *Paul's Hearsay Objection*

■ Over Paul's objection, Rachael Rock testified that when Benny Olivencia came to her door, he stated that "they" had Lori and her baby and that something drastic would happen if the money was not returned.

Paul objected to Rachael testifying concerning Benny's statement that "they" had Lori and her baby on the grounds this statement was hearsay as to Paul and its admission violated the principles of *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. The trial court overruled the objection, finding that the statement was admissible against Paul as the statement of a coconspirator. (Evid. Code, § 1223.)

Evidence Code section 1223 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence." *Aranda* is inapplicable if the statements are admissible within the coconspirator's exception to the hearsay rule. (*People v. Brawley* (1969) 1 Cal.3d 277, 286 [82 Cal.Rptr. 161, 461 P.2d 361]; *People v. Morales* (1968) 263 Cal.App.2d 368, 374 [69 Cal.Rptr. 402].)

Paul contends there was no evidence of a conspiracy between Benny and himself at the time the trial court admitted testimony concerning the disputed statement. Specifically, he contends there was no evidence of an agreement to achieve an unlawful objective. We disagree.

■ A conspiracy "is an agreement between two or more persons (with the specific intent) to achieve an unlawful objective, coupled with an overt act by one of the conspirators in furtherance thereof." (*People v. Earnest* (1975) 53 Cal.App.3d 734, 745 [126 Cal.Rptr. 107]; *People v. Jones* (1986) 180 Cal.App.3d 509, 515 [225 Cal.Rptr. 697].) ■ Only prima facie evidence of a conspiracy is required to permit the trial court to admit evidence under the coconspirator's exception. This fact need not be established beyond a reasonable doubt, or even by a preponderance of the evidence. (*Earnest, supra,* at p. 741.) The conspiracy may be shown by circum-

stantial evidence and "the agreement may be inferred from the conduct of the defendants mutually carrying out a common purpose in violation of a penal statute." (*People* v. *Lipinski* (1976) 65 Cal.App.3d 566, 575 [135 Cal.Rptr. 451], italics and citations omitted; accord: *People* v. *Martin* (1983) 150 Cal.App.3d 148, 163 [197 Cal.Rptr. 655]; *People* v. *Towery* (1985) 174 Cal.App.3d 1114, 1132 [220 Cal.Rptr. 475].)

■ At the time the trial court admitted the disputed hearsay statement, Lori Ceballos had already testified. Viewing her testimony in the light most favorable to the People, it indicated that both Benny and Paul entered her apartment looking for Mark and George. She told them to leave but neither heeded her request. Although it was Benny who made the overt threats, Paul never helped Lori to leave the apartment. Benny specifically told Paul to stay with Lori at the apartment, and Paul in fact stayed there for about 45 minutes. In our view, although this evidence is perhaps susceptible to different interpretations, it is sufficient to show that Benny and Paul were engaged in a conspiracy to falsely imprison Lori and her baby.

## III. *Benny's Additional Contentions*

### A. *Impeachment With Prior Burglary*

■ Benny contends the trial court abused its discretion by admitting evidence of his prior conviction for first degree burglary for impeachment because it was identical to one of the crimes charged in this case. (*People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].) The People concede the prior was improperly admitted, but for different reasons. Upon subsequent investigation, the People learned that the prior used for impeachment was a juvenile adjudication under Welfare and Institutions Code section 602. Juvenile adjudications are not admissible for impeachment. (*People* v. *Sanchez* (1985) 170 Cal.App.3d 216, 218 [216 Cal.Rptr. 21].)

Assuming that the prior was improperly admitted, the error is nonprejudicial. The prior was mentioned only once during Benny's direct examination and was *not* identical to the crime he was actually convicted of. Given the overwhelming evidence against Benny, it is not reasonably probable he would have obtained a more favorable result in the absence of the error. (*People* v. *Castro, supra,* 38 Cal.3d at pp. 318-319.)

### B. *Prosecutorial Misconduct*

■ Finally, Benny contends his conviction must be reversed because the prosecutor asked improper questions concerning his prior arrests.

During cross-examination of Benny the prosecutor apparently intended to impeach Benny's earlier testimony that he had come to California only three weeks before the incident by showing that Benny had been arrested in California nearly two months before. The false imprisonment occurred on May 13, 1986. The prosecutor asked Benny if he had been arrested in Alameda County on March 14, 1986, and in February of 1985. Before Benny could fully respond, defense counsel objected to these questions. After an unreported bench conference was held, the court sustained the objection on unspecified grounds and admonished the jury to disregard the questions and the answer Benny had given.[4]

Benny contends that even though his objection was sustained and the court specifically admonished the jury to disregard the questions and answers, he was nevertheless prejudiced by what he terms the prosecutor's "misconduct." Assuming the questions regarding the prior arrests were improper (see *People* v. *Anderson* (1978) 20 Cal.3d 647, 650 [143 Cal.Rptr. 883, 574 P.2d 1235]) we do not believe Benny has made out a case that the prosecutor was acting in bad faith when he asked those questions. Moreover, even if the prosecutor did engage in misconduct, the court's admonition cured any harm. ▉▉ "A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith [Citations.] It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' [Citation.]" (*People* v. *Allen* (1978) 77 Cal.App.3d 924, 934-935 [144 Cal.Rptr. 6].) We do not believe this is an exceptional case. ▉▉ The court's admonition cured any prejudice and the judgment against Benny need not be reversed.

### Disposition

The judgment as to Benny Olivencia is affirmed. The judgment as to Paul Olivencia is reversed, and the trial court is ordered to proceed in the manner outlined in part II A of this opinion.

Capaccioli, J., concurred.

**BRAUER, J.,** Concurring and Dissenting.—I dissent from the remand for a *Marsden* hearing. I concur in the remainder of the opinion.

The record shows that the defendant filed a one-page handwritten *Marsden* motion on September 16, 1986. It did not name the attorney with whose

---

[4] When asked if he had been arrested in March 1986, Benny responded he didn't remember and asked what he had been arrested for.

services the defendant was dissatisfied. Presumably it was his assigned counsel, Mr. Seiff. The motion recited "Defendant hereby request that the *Marsden* hearing be held before any other pretrial hearing."

It is undisputed that the motion was simply lost in the shuffle.

The record shows further that defendant appeared in court on September 16, September 23, September 30 and October 2. In all of those appearances he was represented by Mr. Pennypacker on behalf of assigned counsel, Mr. Seiff. Then on October 6, 1986, defendant appeared with Mr. Seiff on a number of pretrial motions.

At no time did the defendant call the court's attention to the *Marsden* motion. Had he done so, it would unquestionably have been considered. He should not be heard to cry "tilt" at this late hour.

I would hold that the motion was abandoned as a matter of law. In the alternative, I would direct the trial court to determine whether the motion was abandoned before, and as an alternative to, addressing it on the merits.

Appellants' petitions for review by the Supreme Court were denied January 4, 1989.