Filed 2/25/13  P. v. Jamison CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE, | D060805 |
| Plaintiff and Respondent, |  |
| v. | (Super. Ct. No. SCD222182) |
| HOWARD JAMISON, |  |
| Defendant and Appellant. |  |

APPEAL from a judgment of the Superior Court of San Diego County, Laura W. Halgren, Judge.  Affirmed.

A jury convicted Howard Jamison of the first degree murder of 83-year-old Ewing Scroggs in violation of Penal Code section 187, subdivision (a) (undesignated statutory references will be to the Penal Code unless otherwise specified).  The jury found true an allegation that Jamison personally used a deadly weapon (a knife) within the meaning of section 12022, subdivision (d), and also found true a special circumstance allegation that

he committed the murder while engaged in the commission of a burglary (§ 460) within the meaning of section 190.2, subdivision (a)(17).

At trial, the court denied a mistrial motion Jamison brought after a witness—Jim Rapuano, Jamison's former probation officer in Connecticut—twice volunteered the statement, in the presence of the jury, that Jamison had "an extensive criminal record."

After denying Jamison's new trial motion, which was also based on the probation officer's volunteered statements about Jamison's criminal history, the court sentenced him to life in prison without the possibility of parole plus a one-year prison term enhancement for the true finding on the personal use of a knife allegation.

Jamison appeals, contending the court's denial of his mistrial motion "irreparably damaged" his federal constitutional right to a fair trial and constituted reversible error because Rapuano's improper disclosure that Jamison had an extensive criminal history was "incurably prejudicial" as it was "too dramatic for jurors to ignore." We conclude the court did not abuse its discretion or violate Jamison's federal constitutional right to a fair trial. Accordingly, we affirm the judgment.

FACTUAL BACKGROUND

A. *The People's Case*

On December 10, 1989, relatives went to Scroggs's home to check on him, as he had not answered his phone or shown up for Sunday dinner. They found Scroggs dead under a mattress in one of the bedrooms of his two-bedroom house in the Pacific Beach area of San Diego. The relatives called the police and waited outside.

A deputy medical examiner for the County of San Diego testified that Scroggs had been beaten in the face and chest and stabbed once in the back. Scroggs had suffered significant internal injuries associated with the stab wound and the blunt force trauma of the beating. All the injuries were inflicted at about the same time. The cause of death was the loss of blood from a knife penetrating a kidney and the main vein returning to the heart.

Scroggs's niece testified she tried to call her uncle over the weekend, but he did not answer. She testified that Scroggs, who had been a widower for a couple of years, was "pretty meticulous" and "kept everything in its place." She also said he always carried cash in his wallet, put his car in the garage every night, closed the curtains of the house, and locked the doors. At the time of his death he lived alone, and she never knew him to take in boarders or transients.

The police found no sign of forced entry. Scroggs was found in the bedroom floor, lying on his side with his head almost up against the wall by the top of the bed and partially covered by the mattress, which was off the bed. Things in the bedroom were knocked over, which a detective interpreted as evidence of a struggle. Drawers were pulled out, the storage doors were open, and the room looked ransacked. Scroggs's front right pants pocket was partially pulled out. The police found his wallet, which contained no cash or credit cards, on a dresser. One of the relatives who discovered Scroggs told the police she picked the wallet off the floor and placed it there. A red stain was on the bedroom door, and another was on a dresser drawer.

3

Police found a Marlboro cigarette butt on the floor of the rear bathroom. A kitchen counter drawer with silverware was partially open, and a butcher knife with a bloodstain was found in the kitchen sink. Blood samples were collected by evidence technicians, as were the butcher knife, several latent fingerprints, and the Marlboro cigarette butt.

The retired detective who had been in charge of the crime scene testified it looked like someone had originally committed burglary by entering the house to steal property, but confronted and killed Scroggs, making the crime a robbery and a murder. After some investigation, however, the case went cold in early 1990.

In 2003 a detective in the cold case unit reviewed the case and submitted three bloodstains from the crime scene for DNA analysis. A sample taken from the dresser drawer in the second bedroom was found to be from an unknown male who was not Scroggs. The DNA profile from that sample was entered into the national Combined DNA Index System (CODIS) database to which every crime lab is connected.

In 2009 the blood sample from the dresser drawer was tested again, this time using the most up-to-date DNA analysis that looked at 15 different markers. After the results of this updated analysis were entered into CODIS, the DNA was determined to match Jamison, whose DNA had been entered into the CODIS database by the Connecticut Department of Public Safety. Additional testing showed that the blood on the butcher knife was from Scroggs, and the DNA on the Marlboro cigarette butt matched Jamison. The positive results from the drawer and the cigarette butt were later confirmed through a mouth (buccal) swab DNA sample taken from Jamison in August 2009.

4

In August 2009 Jamison was arrested in Milford, Connecticut, by FBI Agent Allan Vitkosky, who interrogated Jamison and obtained the buccal swab DNA sample from him. After he was told why he was being arrested and after he waived his *Miranda*[1] rights, Jamison admitted he was in San Diego about 20 years earlier, hanging out by himself in the Mission Beach area and panhandling because he did not have a job, and also admitted he turned himself in for "jump[ing] probation." He denied ever being in Scroggs's home, and denied committing the murder. Agent Vitkosky testified that Jamison later started going into some hypotheticals and told the agent that—if he (1) had been in a house in San Diego where he was not supposed to be, (2) did not know whether an old man lived there, (3) left his DNA there by touching or dropping something like a cigarette butt, and (4) then ran out of the house after seeing "something gruesome"—that would not mean he killed somebody.

B. *The Defense Case*

The defense presented no evidence.

DISCUSSION

Jamison's sole contention on appeal is that the court's denial of his mistrial motion irreparably damaged his federal constitutional right to a fair trial and constituted reversible error because Rapuano's improper disclosure that Jamison had an extensive criminal history was "incurably prejudicial" as it was "too dramatic for the jurors to ignore." This contention is unavailing.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

A.  *Background*

Jamison had an extensive criminal history, including at least seven prior felony convictions from various states.  The prosecutor brought an in limine motion seeking to introduce under Evidence Code section 1101, subdivision (b), evidence of some of those prior convictions, including convictions for residential burglary and assault on an elderly victim, to show identity, common plan or scheme, and intent to stab Scroggs.  After hearing argument and taking the matter under submission, the trial court excluded the prior bad acts evidence.  However, the court ruled that evidence of Jamison's outstanding warrant was admissible to show he was in San Diego during the relevant time period and to show he was extradited back to Connecticut.

Prior to the testimony of Jamison's half-brother, Jeff Jamison; his Connecticut friend, Jay Sparks; and Rapuano, his former probation officer in Connecticut—all of whom were familiar with Jamison's criminal past—the court told the prosecutor to caution the witnesses not to volunteer information about Jamison's criminal history.

During the cross-examination of Rapuano, defense counsel asked him whether he remembered a specific date, and Rapuano responded, "Counsel, I can't give dates.  Mr. Jamison has an *extensive criminal record*—."  (Italics added.)  The court interrupted Rapuano's answer and admonished him to listen to the question asked and answer yes or no.

Shortly thereafter, defense counsel asked Rapuano about a certain timeframe following Jamison's extradition to Connecticut, and the following exchange took place:

"Q:  From the time that—between the time that he came from San Diego and January 23rd of 1990, Mr. Jamison did not live at Orange Avenue, correct?

"A:  He lived intermittently at Orange Avenue.

"Q:  I am asking you, from the period of December 12 to January 23 of 1990, did he live at Orange Avenue?

"A:  That, I'm not certain of.

"Q:  You know that he was brought back to Connecticut in custody, right?

"A:  Yes.

"Q:  And he stayed in custody once he got back to Connecticut, right?

A:  Um-hmm.

"Q:  Is that a 'yes'?

"A:  Well, he made bond at one point.  [¶] Your Honor, if I could have some leverage [*sic*] on these questions because *he has an extensive criminal record—*."  (Italics added.)

Interrupting Rapuano again, the court asked him to "please stop" and immediately sent the jury out of the courtroom.  The court then inquired as to whether the prosecutor had properly admonished Rapuano prior to his testimony, and the prosecutor replied that she had "admonished him a hundred percent," just as she had admonished Jeff Jamison and Sparks, and she specifically told Rapuano that if the only way he could truthfully answer a question was to refer to Jamison's criminal history, he should say he needed to refer to something in his report, and the prosecutor would then request a sidebar to get a ruling from the court.

7

Accepting the prosecutor's representation, the court admonished Rapuano that he was in violation of the court's rulings and needed to refrain from volunteering such information. The court then reiterated the specific areas that Rapuano could not address, stating, "You must not refer to incarceration. You must not refer to prior convictions or any other information relating to criminal history other than the limited portion relating to the absconding and then extradition on the warrant."

Rapuano explained to the court he had made the statement because it was extremely difficult to answer questions regarding specific dates as Jamison had multiple probation violations and escapes from custody and from mental health institutions, and the document to which Rapuano had access was not specific as to dates of dispositions. The court instructed Rapuano he should answer that he did not have the information.

1. *Denial of Jamison's mistrial motion*

Following further discussion, defense counsel requested a mistrial. The trial court denied the request but informed defense counsel it would give a cautionary instruction to the jury and stated it believed it had already stricken the testimony.

Stating, "[J]ust so we don't get into more issues," the court permitted defense counsel to examine Rapuano at an Evidence Code section 402 hearing so that counsel could ask him any remaining questions and elicit whether he knew the answers. During the hearing, Rapuano was unable to clearly testify as to defense counsel's previous question regarding whether Jamison was in custody during a particular timeframe. The court ruled that further questioning as to that issue would open the door to details about Jamison's criminal history during the time period of December 1989 through 1991, which

8

included a burglary, contempt of court, and escape from custody. The court then asked defense counsel whether it should say anything further about striking Rapuano's reference to Jamison's criminal history or give a cautionary instruction at the end of trial instead. Defense counsel requested a cautionary instruction at the end of trial, stating, "I don't want to draw further attention to the issue."

When the jurors returned, the court told them, "The last answer of the witness prior to excusing the jury will be stricken. The jury is to disregard that."

Later, shortly before the lunch break and out of the presence of the jury, the court invited defense counsel to craft a suggested limiting instruction for the court to read to the jury at the close of trial.

2. *Renewal and denial of Jamison's mistrial motion*

When the proceedings recommenced after the lunch break, defense counsel renewed the motion for a mistrial, claiming a curative instruction would not fix the problem but, instead, would highlight the issue and further prejudice Jamison. The prosecutor opposed the motion, arguing that "the situation was rectified" when the court interrupted Rapuano, whose answer "tailed off" following his reference to Jamison's criminal record, and when the court "quickly cured to the jury and stated 'please disregard anything.' "

The court again denied Jamison's mistrial motion, indicating that some sort of limiting instruction might be appropriate. The court suggested adding to the instruction regarding the limited use of the evidence pertaining to Jamison's absconding from

9

probation, an instruction that any other information relating to criminal history be disregarded.

### 3. *Limiting instruction*

During the discussion regarding jury instructions, defense counsel changed his mind and requested a limiting instruction. The court later instructed the jury with the following modified version of CALCRIM Nos. 303 and 375:

> "During the trial, certain evidence related to Defendant's connection with the criminal justice system was admitted for the limited purpose of proving his presence in San Diego on December 11, 1989, and subsequent extradition back to Connecticut. [¶] Do not consider this evidence for any other purpose. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] This evidence is not sufficient by itself to prove that the defendant is guilty of the charged crime or allegations. The People must still prove the charge and allegations beyond a reasonable doubt. [¶] *Do not consider any other evidence of criminal history for any purpose*." (Italics added.)

### 4. *Denial of Jamison's new trial motion*

At the sentencing hearing, the court addressed the issue again in the context of a defense motion for a new trial. In denying the motion, the court stated that Rapuano's reference to Jamison's extensive criminal history was "essentially nonresponsive[]" during defense questioning that was "a difficult area for [Rapuano] to correctly testify to without addressing [Jamison's] criminal history." The court added:

> "[U]nder the circumstances and the way it developed, by immediately sending the jury out, discussing the matter with the witness, then striking the testimony and later giving a curative instruction at the end of the case, I feel that the court did everything it could do, and *I don't think that those statements were prejudicial* given the overall context of the case and the evidence." (Italics added.)

10

B. *Applicable Legal Principles*

"'A motion for mistrial is directed to the sound discretion of the trial court [and ]should be granted if the court is apprised of prejudice [it deems] incurable by admonition or instruction.'" (*People v. Cox* (2003) 30 Cal.4th 916, 953.) "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 986.)

Thus, "[w]hether in a given case the erroneous admission of [evidence of the defendant's prior criminality] warrants granting a mistrial or whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581, citing *People v. McLain* (1988) 46 Cal.3d 97, 113.)

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Silva* (2001) 25 Cal.4th 345, 372.)

C. *Analysis*

We are guided by the California Supreme Court's decision in *People v. Bolden* (2002) 29 Cal.4th 515 (*Bolden*). At trial in that murder case, the prosecutor asked a police officer a question about the defendant's address, and the officer answered, "It was at the Department of Corrections parole office located at—." (*Id*. at p. 554.) The prosecutor interrupted the officer's testimony and redirected his attention to the question

11

the prosecutor had asked. (*Ibid.*) Later, outside the presence of the jury, the defense moved for a mistrial on the ground the witness's reference to a parole office was very prejudicial to the defendant because it implied he had suffered at least one prior felony conviction for which he had served a state prison sentence. (*Id*. at pp. 554-555.) At the hearing on the motion, the prosecutor assured the trial court he had warned the witness on three occasions not to refer to the parole office, and he was "taken by surprise" when the witness mentioned the parole office. (*Id*. at p. 555.) In denying the mistrial motion, the trial court found there was insufficient prejudice to warrant a mistrial because the reference to the parole office was unlikely to make a lasting impression on the jury. (*Id*. at p. 555.) The Supreme Court held in *Bolden* that the trial court did not abuse its discretion in ruling that the defendant's chances of receiving a fair trial had not been irreparably damaged because the witness's reference to the parole office was brief, the prosecutor interrupted the witness's testimony before he could complete the answer, and "[t]he incident was not significant in the context of the entire guilt trial." (*Ibid*.)

Similarly here, like the officer who testified in *Bolden*, Rapuano briefly answered a question in a manner that allowed the jury to learn that Jamison had a criminal record. As in *Bolden*, the prosecutor had admonished the witness not to divulge such information. When Rapuano twice referred briefly to Jamison's criminal history, the court took steps above and beyond those taken in *Bolden* to cure any possible prejudice to the defense. Specifically, when Rapuano first mentioned Jamison's criminal history, the court immediately interrupted his answer and admonished him to listen to the question asked and answer yes or no.

12

When Rapuano briefly mentioned Jamison's criminal history a second time, the court again immediately cut him off, excused the jury, admonished Rapuano, held an Evidence Code section 402 hearing to prevent any additional references to Jamison's criminal record in front of the jury, and then brought the jurors back and told them Rapuano's "last answer" was stricken and they were to "disregard" it.

In addition to the foregoing effective steps the court promptly took to cure any potential prejudice to the defense, the court later instructed the jury not to consider evidence of Jamison's criminal history "for any purpose" except for "the limited purpose of proving his presence in San Diego on December 11, 1989, and subsequent extradition back to Connecticut." " 'A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith. [Citations.] It is only in the exceptional case that "the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions." ' " (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1404, quoting *People v. Allen* (1978) 77 Cal.App.3d 924, 934-935; see also *People v. Cox, supra,* 30 Cal.4th at p. 953 [upholding the trial court's denial of a defense mistrial motion, explaining that "[i]n the context of erroneously offered polygraph evidence, we have held that a trial court's timely admonition, which the jury is presumed to have followed, cures prejudice resulting from the admission of such evidence"], disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

We are persuaded this case is not exceptional. The record is devoid of any showing of bad faith. As noted, the court took many curative measures and, in any event,

the jury permissibly knew from the testimony of Jamison's former probation officer in Connecticut—Rapuano—that he had some sort of criminal record and had absconded from probation before he was arrested in San Diego in December 1989. We conclude the court did not abuse its discretion in denying Jamison's mistrial motion.

Even if we were to conclude the court erred, we would also conclude any such error was harmless in light of the overwhelming evidence of Jamison's guilt discussed, *ante*, in the factual background. For example, the evidence showed Jamison's DNA was found both in a bloodstain on Scroggs's dresser and on the Marlboro cigarette butt collected from Scroggs's home. In addition, Jamison's half-brother, Jeff Jamison, testified that Jamison had told him he had murdered someone in California. Jeff Jamison also testified that Jamison smoked Marlboro cigarettes, the brand of the cigarette found at the crime scene. For all of the foregoing reasons, we affirm the judgment.

## DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.

14