Filed 2/2/21  P. v. Gibson CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B301074 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA110504) |
| v. | |
| CODELL GIBSON III, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Judith Levey Meyer, Judge.  Affirmed and remanded with directions.

Jeanine Grimmond Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Charles J. Sarosy, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In a three-count information filed by the Los Angeles County District Attorney's Office, defendant and appellant Codell Gibson III was charged with inflicting corporal injury on a girlfriend (count 1; Pen. Code, § 273.5, subd. (a)),[1] false imprisonment by violence (count 2; § 236), and misdemeanor contempt of court (count 3; § 166, subd. (c)(1)). He pleaded not guilty. The jury found defendant guilty as charged.

Defendant was sentenced to a total of two years in state prison, calculated as follows: the low term of two years for count 1, a concurrent low term of 16 months for count 2, and a concurrent term of 364 days for count 3.[2]

The trial court imposed a $300 restitution fine (§ 1202.4, subd. (b)), a $90 court facilities assessment (Gov. Code § 70373), and a $120 court security assessment (§ 1465.8), and imposed and stayed a $300 parole revocation restitution fine (§ 1202.45).[3]

Defendant filed a timely notice of appeal.

On appeal, he argues: (1) His conviction of false imprisonment by violence is not supported by substantial

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant also pleaded no contest in a separate case for domestic battery (§ 243, subd. (e)(1)). He was sentenced to 364 days to be served concurrently with the previously described two-year term for count 1, and no additional fines or fees were imposed.

[3] There is a discrepancy between the minute order, which sets forth the amounts identified above, and the reporter's transcript, which identifies the facilities assessment as $60 and the court security assessment as $80. The abstract of judgment mirrors the amounts set forth in the reporter's transcript.

2

evidence; and (2) Pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant is entitled to a hearing to determine his ability to pay the court-imposed fines and assessments.

As pointed out by the People there is a discrepancy between the trial court's July 18, 2019, minute order and the abstract of judgment regarding the fines and assessments imposed against defendant. Upon remand, we direct the clerk of the trial court to prepare an amended abstract of judgment to reflect the amounts of the fines and assessments as correctly set forth in the trial court's July 18, 2019, minute order and forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

## FACTUAL BACKGROUND

I. *Prosecution evidence*

A. <u>Defendant and his girlfriend arrived at a hotel where they were often seen together, and the girlfriend was later found outside defendant's room covered in blood</u>

On October 12, 2018, defendant and C.C. arrived together at a Long Beach hotel at around 12:30 or 1:00 a.m. Defendant had been staying at the hotel for approximately six or seven months before that night. A hotel security guard, Solomon McCorvey (McCorvey), recognized both defendant and C.C., who he knew was defendant's "girlfriend/wife/significant other." Although C.C. was not a registered guest at the hotel, McCorvey had seen C.C. several times at the hotel with defendant.

Defendant and C.C. left the lobby to go up to defendant's room on the 10th floor, room 1006. C.C. returned to the lobby after about 10 to 20 minutes and asked for a room key, which McCorvey gave to her. About 10 to 15 minutes later, McCorvey conducted his rounds, a process in which he walks the length of

3

every hotel floor in about 10 to 15 minutes. There were no noises or disturbances when he passed room 1006.

At about 1:00 or 2:00 a.m., Kerry King (King) and Luke Errett (Errett), guests in the room next to room 1006, heard a woman "shrieking, screaming" for help. The screams lasted about 20 seconds, long enough for Errett to wake up, put on his glasses, and get to the door of his own room. When King and Errett entered the hallway, C.C. was lying on her back on the floor, not moving and covered in blood. King turned C.C. on her side because she feared that C.C. would choke on her own blood. There was a significant amount of blood on the carpet and bloody handprints on the doorway to room 1006. Errett saw defendant walking away from C.C. and into a staircase at the end of the hallway.

Another guest on the 10th floor opened his door and stated that he had called 911. King asked C.C. who had done this to her, and C.C. identified defendant by name. Several minutes later, defendant, who was wearing only a shirt, came back into the hallway to return to room 1006. Errett asked defendant if he was the person C.C. had identified, and defendant confirmed that it was him. Errett asked defendant what had happened, and defendant responded, "'She had it coming. She was trying to break into the room.'"[4]

Defendant then entered room 1006 and went out a couple of minutes later wearing a new set of clothes. In a "frighteningly calm" and "chilling" manner, defendant said something to the

---

[4] C.C. was about 5 feet 8 inches tall and weighed about 145 pounds, whereas defendant was about 6 feet 1 inch tall and weighed about 230 or 240 pounds.

4

effect of, "'Really, [C.C.]?'" or "'Are you kidding me? You're really going to go through with this.'" He then walked to the opposite end of the hallway and left through the staircase.

Meanwhile, at the front desk, McCorvey was notified that a guest from the 10th floor had called 911. McCorvey immediately went to the 10th floor hallway, saw guests helping C.C., and asked a guest for towels to help stop the bleeding. Paramedics arrived and took C.C. to the hospital.

B. C.C. had multiple injuries to her head that were consistent with her hair being pulled; defendant was arrested

C.C.'s injuries included a bloody nose, hair falling out from being pulled on, an eye that was swollen shut, bruising on both eyes, petechia[5] on one of her eyes, and swelling on her face. The back of C.C.'s neck had a scratch along the hairline, as well as matted blood, which were consistent with her hair being pulled. C.C. told the treating doctor that she had been "struck in the face and head with fists and feet as well as choked," and she was unsure whether she had lost consciousness during the incident.

As defendant walked away from the hotel in the parking lot, he was arrested by Long Beach Police Department Officer Brian Prebanda. Defendant had dry blood on his forearms and hands, which he admitted was his girlfriend's blood. Defendant did not have any visible injuries, but had a "light redness" on his leg. He also had C.C.'s cell phone.

---

[5] Petechia is a red dot in the eye that occurs when a blood vessel in the eye bursts due to lack of oxygen; it is common in cases of strangulation.

5

C. <u>Blood spatter on the door of the hotel room suggested to a detective that C.C. was trying to get out of the room</u>

At around 3:30 to 4:00 a.m., Long Beach Police Department Detective Elizabeth Barba, who worked in the sex crimes unit, met C.C. at the hospital. A few hours later, Detective Barba took C.C. back to the hotel to collect her belongings. C.C. retrieved her items from the closet, bathroom, and the floor, and packed them into her suitcase, which was already in the room along with defendant's suitcase. C.C. retrieved a contact lens from the floor that had been knocked out, as well as her "'emergency phone'" from behind the couch.

There was blood on the bed, a picture frame on a wall leading towards the bathroom, the carpet, and the doorway. There was blood spatter on the floor that appeared to be going in the direction of the inside of the room towards the door, which was the only way to exit the room. There was blood on the outside of the doorway as well. The location and pattern of the blood droplets suggested to Detective Barba that C.C. had been leaning forward and trying to get out of the room. Pieces of C.C's blonde hair were also "everywhere," such as on the floor in various areas of the room and on the bed. There was blonde hair on the carpet, as well as clumps of blonde hair on the comforter and the space between the bed and the sofa.

Defendant called C.C. four times while she was with Detective Barba, but C.C., who was trembling and scared when she received the calls, did not answer.[6]

---

[6] C.C. did not testify at trial. Although Detective Barba called and spoke to C.C. one time after the incident, C.C. did not respond to subsequent calls. According to defendant, C.C. was living in Kentucky at the time of the trial.

6

II. *Defense evidence*

Defendant testified on his own behalf.

Defendant and C.C. met in California around 2015 and began an on-and-off sexual relationship that carried on through October 2018. Both defendant and C.C. were married to other people when they began their relationship. Defendant lived primarily in Kentucky, but he occasionally came to California for work for extended periods of time. When he came to California, he would see C.C. once or twice a week because his job could require him to work 16-hour days. At some point, C.C. stayed with defendant off and on in Kentucky for a few months at a time, and she had brought some of her things with her. Although defendant was seeing other people besides C.C., she was his girlfriend in October 2018.

Defendant had been arrested for domestic violence incidents involving C.C. at Long Beach hotels in both 2015 and 2016, but he was not convicted in either case. In August 2018, a protective order had been issued against him in California, which prohibited him from contacting C.C.[7] That order had been issued after an August 5, 2018, incident where police responded to a domestic violence call at the same Long Beach hotel where the October 12, 2018, incident occurred.[8] Defendant denied hitting

---

[7] The criminal protective order was issued on August 30, 2018. After sentencing in the trial at issue here, defendant pleaded guilty to a charge of domestic battery (§ 243, subd. (e)(1)) based on the August 5, 2018, incident.

[8] Long Beach Police Department Officer Keyen Foley testified about this incident, and the trial court took judicial notice of the protective order, during the prosecution's case-in-chief.

C.C. and testified that he had blood on his hand because he had a recurring scab on his nose that bled.

On October 12, 2018, defendant went to a night club. C.C. arrived at the same club and sat down at his table. Because of the protective order, defendant left the club so he "wouldn't get in trouble." He returned to the hotel alone and then prepared to go to sleep. Defendant texted C.C. not to come to the room, and he asked her where he should send her things.

Sometime after he had fallen asleep, C.C. entered the room, jumped on top of him in the bed and started hitting him. Defendant did not know who was attacking him, so he "came up swinging" and threw the person into the wall. When he realized that the person in his room was C.C., he lifted her off the ground and pushed her out of the room. Scared, defendant left the hallway, but returned to the room to change because he was not fully clothed. Defendant told Errett that, "she broke into my hotel room, and she attacked me."

At the time of his arrest, defendant told Officer Prebanda that the blood on his forearms and hands was C.C.'s, but did not recall having C.C.'s phone in his possession.

III. *Rebuttal evidence*

The prosecution had two rebuttal witnesses. Officer Prebanda addressed defendant's statements at the time of his arrest. When he was arrested, defendant told Officer Prebanda that hotel security let C.C. into the room and defendant was aware it was C.C. C.C. immediately jumped on top of defendant and started hitting him. After being arrested, defendant told Officer Prebanda that the phone in his possession belonged to C.C.

Officer Foley, who responded to the August 2018 incident, testified that defendant had no blood or injuries on his nose or face on August 5, 2018.

**DISCUSSION**

I. *Substantial evidence supports defendant's conviction for false imprisonment by violence*

Defendant contends that there is insufficient evidence to support his conviction for false imprisonment because there is no evidence that C.C. was restrained in the hotel room and her injuries alone do not permit an inference of restraint. He further argues that the jury could have convicted him of false imprisonment based on improper speculation.

A. <u>Standard of review and relevant law</u>

When considering a challenge to the sufficiency of the evidence supporting a conviction, an appellate court reviews the entire record in the light most favorable to the judgment to determine whether it contains reasonable, solid, and credible evidence from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (2015) 60 Cal.4th 966, 988.) A reviewing court does not invade the province of the jury by reweighing the evidence, or by re-reconciling competing circumstances and redrawing competing inferences from those circumstances; it is the jury—not the appellate court—that must be convinced of the defendant's guilt beyond a reasonable doubt. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055–1056.) "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.)

9

This standard applies when the evidence is primarily circumstantial, and the appellate court "must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

Section 236 provides: "False imprisonment is the unlawful violation of the personal liberty of another." Any exercise of express or implied force which compels another person to remain where she does not wish to remain, or to go where she does not wish to go, is false imprisonment. (*People v. Agnew* (1940) 16 Cal.2d 655, 659–660.) The essential element of false imprisonment is restraint. (*Id.* at p. 659.) The restraint must be of "a person's *freedom of movement*" because the statutory language "clearly suggests it relates to the personal liberty to be free from physical restraint." (*People v. Bamba* (1997) 58 Cal.App.4th 1113, 1121.) The restraint can be short in time and distance (*People v. Riddle* (1987) 189 Cal.App.3d 222, 230), and the victim need not be restrained in a confined space (*People v. Fernandez* (1994) 26 Cal.App.4th 710, 718 (*Fernandez*)).

False imprisonment is a general intent crime. (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1397–1398.) The offense is a felony if the restraint is effected by violence, menace, fraud or deceit. (§ 237; *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1356–1357.) "Violence" in this context is the use of force greater than that reasonably necessary to effect the restraint. (*People v. Hendrix* (1992) 8 Cal.App.4th 1458, 1462.)

B. <u>Analysis</u>

Applying these legal principles, we conclude that substantial evidences supports defendant's conviction for false imprisonment by violence. Hotel guests heard a woman

screaming for help for about 20 seconds. Both the length of the screaming and the fact that no witness heard a man's voice suggest that the woman screaming was in a situation from which she wished to escape. It was entirely reasonable for the jury to rely on a lengthy scream to infer that C.C. was being restrained against her will, particularly when considered in context with the other circumstantial evidence.[9]

Thereafter, two hotel guests found C.C. outside of room 1006, bloody. Police officers later found clumps of C.C.'s hair on the bed and on the hotel room floor, and a mark on the back of her neck suggested that her hair had been pulled out. From this evidence, the jury reasonably could have inferred that defendant was restraining C.C. in the hotel room and using her hair to pull her closer to him, rather than push her away as he claimed in his trial testimony.

Moreover, the fact that her hair was pulled out and found in multiple places in the room suggests that defendant used force beyond that necessary to prevent C.C. from leaving the room. *People v. Castro* (2006) 138 Cal.App.4th 137, 143 (*Castro*) is instructive. In that case, the appellate court held that the defendant had used sufficient force to satisfy the elements of

_____

[9] In his reply brief, defendant discounts this evidence by claiming that C.C. was screaming only after she left room 1006 because there is no direct evidence that she was screaming from inside the room. Defendant is essentially asking us to reweigh the evidence, something we cannot, and will not, do. (*People v. Prunty* (2015) 62 Cal.4th 59, 89 (conc. & dis. opn. of Cantil-Sakauye, C. J.; *People v. Alexander* (2010) 49 Cal.4th 846, 882–883.)

false imprisonment by violence where he had approached a young girl on the street, grabbed her arm, turned her around, and pulled her a few steps toward his car. The court noted that the restraint was accomplished by the time the defendant had turned the victim around. (*Ibid*.) The use of additional force by pulling her towards his car, even just a few steps, was sufficient to constitute violence because that force was greater than that reasonably necessary to effect the restraint.

Much like the defendant in *Castro*, defendant had already accomplished the restraint of C.C. when he pulled on her hair, and in pulling her hair out, he used force significantly greater than reasonably necessary to accomplish that restraint. Indeed, the instant case is stronger than *Castro* because the additional force required to pull out someone's hair is significantly greater than that required to pull a young person a few steps in one direction. (*Castro*, *supra*, 138 Cal.App.4th at p. 143.) The fact that C.C. did not testify, unlike the complaining witness in *Castro*, does not change our conclusion. (*Id*. at p. 140.)

In addition to the pulled-out hair evidence, there was also a large amount of blood, not only in the hallway and on the outside of the door, but inside the room as well. Inside the hotel room, there was blood on the bed, a picture frame, the carpet, and the doorway. The pattern of blood near the doorway inside the room suggested that C.C. had been leaning forward toward the door. Such blood spatter is consistent with injuries caused to C.C. as she tried to leave the room, rather than as if she had fought to stay inside of the room. Detective Barba opined as

much, and the jury reasonably could have believed such opinion based on their own review of photographs of the hotel room.[10]

Urging us to reverse, defendant argues that the record lacks any evidence, beyond C.C.'s injuries, that defendant restrained or confined C.C. in the hotel room. Aside from the fact that he offers no legal authority for the proposition that injuries alone cannot permit an inference of restraint, as set forth above, there was ample evidence beyond C.C.'s injuries of restraint. To conclude otherwise, we would have to reweigh the evidence, something we cannot, and will not, do. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [we do not reweigh the evidence or resolve conflicts in the evidence]; *People v. Ceja* (1993) 4 Cal.4th 1134, 1139 [if the circumstances reasonably justify the factfinder's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding]; *People v. Bean* (1988) 46 Cal.3d 919, 932–933 [same].)

Defendant further asserts that affirming the false imprisonment conviction here would allow a battery and other similar offenses to be charged as false imprisonment. We are not convinced.

---

[10]    In his reply brief, defendant asserts that Detective Barba did not offer any such opinion. Defendant is mistaken. When asked if there was "[a]nything significant about those droplets of blood in your opinion," Detective Barba replied that it seemed that she was "leaning somewhat forward in an attempt to get out of the room, and that's where the droplets" came from.

*Fernandez*, *supra*, 26 Cal.App.4th 710 helps us reach this conclusion. In *Fernandez*, the victim was running away from the defendant and several others. (*Fernandez*, *supra*, at pp. 712–713.) The defendant caught up to the victim and pulled him down, restraining him "long enough for [the victim] to suffer over 20 kicks." (*Id.* at p. 718.) In affirming the conviction for false imprisonment, the court distinguished between the battery and the false imprisonment by pointing out that "[the defendant] and the others could have hit [the victim] without holding him down." (*Ibid.*) Though the battery and false imprisonment in *Fernandez* occurred at the same time, the court was able to identify two distinguishable offenses and uphold the conviction. (*Ibid.*)

Similarly, here, the injury inflicted on C.C. and the false imprisonment offenses also occurred at the same time, but they were two separate offenses. As in *Fernandez*, defendant could have hit C.C. without restraining her, but based on the evidence and inferences described above, a rational jury could have found that defendant both injured C.C. and prevented her from leaving his hotel room. The prosecutor told the jury as much when he explained, "[defendant] was brutally . . . assaulting his girlfriend, and when he was doing so, he was preventing her from leaving the room." Thus, it does not follow that affirming defendant's conviction on these facts would lead to false imprisonment charges in all battery and related offense cases.

II. *Restitution fines and assessments*

Defendant argues that the trial court erred in imposing the assessments and fines without first determining that he had the ability to pay, in violation of his federal and state constitutional rights. In support, he relies on *Dueñas*, *supra*, 30 Cal.App.5th 1157. We have previously "conclude[d] that *Dueñas* was wrongly

decided." (*People v. Hicks* (2019) 40 Cal.App.5th 320, 324 (*Hicks*), review granted Nov. 26, 2019, S258946; accord, *People v. Kingston* (2019) 41 Cal.App.5th 272, 279–282; *People v. Kopp* (2019) 38 Cal.App.5th 47, 96–97, review granted Nov. 13, 2019, S257844.)  It follows that we reject defendant's challenge to the assessments and fines, including his contention that he was denied effective assistance of counsel for failing to raise this issue at sentencing.

That said, as pointed out by the People, there is a discrepancy between the trial court's July 18, 2019, minute order, which lists the facilities assessment as $90 and the court security assessment as $120, and the reporter's transcript, which identifies the facilities assessment as $60 and the court security assessment as $80.  The abstract of judgment mirrors the reporter's transcript.

Ordinarily, discrepancies between the reporter's transcript and the clerk's transcript "are resolved in favor of the reporter's transcript unless the particular circumstances dictate otherwise." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 249; see also *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)  This general principle does not apply where the trial court did not orally pronounce the correct, statutorily mandated assessments. (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483–484.)  And, where harmonization of discrepancies is not possible, "'that part of the record will prevail, which, because of its origin and nature or otherwise, is entitled to greater credence [citation].'"  (*People v. Smith* (1983) 33 Cal.3d 596, 599.)

In this case, the minute order sets forth the correct amounts because defendant was convicted on three counts, and the statutes at issue specifically include both felony and

misdemeanor convictions.  (Gov. Code § 70373, subd. (a)(1) ["The assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony"]; § 1465.8, subd. (a)(1) ["[A]n assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense"]; see also *People v. Castillo* (2010) 182 Cal.App.4th 1410, 1415, fn. 3; *People v. Roa* (2009) 171 Cal.App.4th 1175, 1181.)  Accordingly, the abstract of judgment must be corrected to match the July 18, 2019, minute order.  We therefore direct the clerk of the trial court to (1) prepare an amended abstract of judgment reflecting the correct amount of both assessments ($90 facilities assessment and $120 court security assessment); and (2) forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.  (*People v. Sinclair* (2008) 166 Cal.App.4th 848, 856–857.)

# DISPOSITION

The clerk of the trial court is directed to (1) prepare an amended abstract of judgment reflecting a $90 facilities assessment and a $120 court security assessment; and (2) forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT


17