Filed 3/26/13  P. v. Martinez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　v.<br><br>MANUEL ALEJANDRO MARTINEZ,<br><br>　　Defendant and Appellant. | G045725<br><br>(Super. Ct. No. 09CF0998)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Dan Barrett McNerney, Judge.  Affirmed as modified.

Laura G. Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

\*　　　　　\*　　　　　\*

A jury convicted defendant Manuel Alejandro Martinez of first degree murder (count 1; Pen. Code, § 187, subd. (a))[1] and found true the special circumstance of murder committed for street gang purposes (§ 190.2, subd. (a)(22)), and that he committed the murder to benefit a criminal street gang (§ 186.22, subd. (b)(1)). The jury also convicted him of street terrorism (count 2; § 186.22, subd. (a)). In a bifurcated trial, the court found defendant suffered one prior serious and violent felony conviction (§§ 667, subds. (d) & (e)(1), 1170.12, subds. (b) & (c)(1)), and one prior street terrorism conviction (§ 667, subd. (a)(1)), and had served a prior prison term (§ 667.5, subd. (b)). The court sentenced defendant to life in prison without the possibility of parole on count 1 and imposed (and stayed) a 10-year term for the associated gang enhancement. The court sentenced defendant to a concurrent four-year term on count 2. Finally, the court sentenced defendant to a five-year term for the prior street terrorism conviction, to be served prior to the count 1 sentence.

Defendant contends the prosecutor committed misconduct during her closing argument, the court erred by instructing the jury on mutual combat, he was prejudiced by testimony concerning an accomplice's jailhouse letter, his 10-year term for the gang enhancement must be stricken, and his street terrorism sentence must be stayed. As to this last contention, he is correct. We modify the judgment and affirm.

FACTS

Defendant was a member of the Fifth Street criminal street gang. One night he was hanging out in the Fifth Street neighborhood and smoking methamphetamine with two fellow gang members (Frank Sincox and John Murillo) and a member of a non-rival

[1] All further statutory references are to the Penal Code unless otherwise stated.

2

gang (Daniel Miramontes). The foursome then hung out with other people in a motel room where everyone smoked methamphetamine and Murillo drank hard liquor. Murillo started getting rowdy.

The foursome then got into Murillo's van and Murillo started driving. Sincox sat in the front passenger seat while defendant and Miramontes sat in the back seat. Murillo started "challenging" defendant and Sincox. Murillo told them "they don't know how to gang bang," so they should "go out today and do something." Murillo said they should smash on members of their rival, the Seventeenth Street gang.

Miramontes received a phone call from a girl he knew, who reported a "suspicious" man was in Fifth Street territory dressed in checkered shorts. Murillo said they should "go gang banging, smashing some guys." Murillo said this was Sincox's "beef" or fight.

They drove down Fifth Street and found Alex Moreno Cruz, who matched the caller's description. Cruz was a 22-year-old member of the Santa Nita gang, a rival of the Fifth Street gang. The foursome in the van exchanged gang signs and slogans with Cruz.

Murillo made a U-turn and parked. Defendant, Murillo, and Sincox got out of the van. Defendant and Sincox walked up to Cruz and asked where he was from (a "hit-up" in gang parlance). Cruz put his hands up, stepped back, and answered: "I'm from nowhere"; "I don't bang."

Defendant and Sincox began hitting Cruz. At some point, Cruz reached in his waistband. Sincox then reached under his own shirt too. Cruz went down to the ground, screaming. Sincox's hand was bleeding.

Murillo drove defendant, Sincox, and Miramontes, and dropped them off. The threesome started walking toward Sincox's house. Defendant said, "I lost the knife, I lost the knife," sounding paranoid, but then said, "I found it."

When defendant was arrested, he had a Winchester folding knife, with Cruz's blood on it, in his pocket.

An autopsy showed Cruz suffered four stab wounds, two of which caused his death.

The gang expert opined, in response to a hypothetical question, that the homicide was committed for the benefit of and in association with a criminal street gang and to promote, further, and assist the gang members' criminal conduct.

*Defense*

Defendant testified Sincox first went up to Cruz. Sincox and Cruz argued loudly. Defendant feared for Sincox's safety because Cruz had reached to his waist and defendant thought Cruz was grabbing a weapon. Defendant got out of the van with his knife and took a few steps toward Sincox and Cruz. Cruz came at defendant and started hitting defendant. Defendant swung the knife at him. The whole time Cruz kept fighting while defendant kept backing up. The fight stopped when Cruz went down on one knee.

DISCUSSION

*The Prosecutor Did Not Commit Misconduct*

Defendant asserts the prosecutor committed misconduct during her closing argument by (1) asserting that defendant's gang membership predisposed him to violence and to premeditate murder, (2) likening gang members to dogs that kill instinctively, and (3) arguing the prosecution did not bear the burden of proving he did not act in imperfect self-defense.

Defendant has forfeited the last two of these claims. "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition

4

would not have cured the harm caused by the misconduct" (*People v. Price* (1991) 1 Cal.4th 324, 447) or if "an objection would have been futile" (*People v. Arias* (1996) 13 Cal.4th 92, 159). "A defendant claiming that one of these exceptions applies must find support for his or her claim in the record." (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

Defendant did not object to the prosecutor's comments comparing gang members to dogs who instinctively kill squirrels. On appeal he argues an objection would have been futile, since the court had already refused his attorney's request to admonish the jury that the prosecutor had improperly argued that gang membership can be used to show character and premeditation. Defendant's argument is not persuasive, since the prosecutor's comments about dogs were not implicitly approved by the court's ruling that the prosecutor's statements about a gangster's mindset were relevant to the issues of intent, motive, and cooperation.

Defendant did not object to the prosecutor's assertion she had no burden to prove he did not act in imperfect self-defense. Although Murillo's counsel objected, defendant's counsel did not join in. Defendant's failure to object does not fall within either exception to the timely objection requirement, and he has therefore forfeited the issue. Moreover, any error would be harmless since the court admonished the jury that the prosecutor's statement was erroneous and that the People bore the burden of proving defendant did not act in imperfect self-defense or defense of others.

Defendant did, however, preserve his first claim of prosecutorial misconduct for appellate review by objecting to the prosecutor's assertion that gang members are predisposed to violence. In her closing argument, the prosecutor described a gangster's mindset toward rivals: "All of the credible evidence in this case indicates that gangsters walk around with this state of mind, basically with malice aforethought, toward any rival . . . they . . . come across. . . . [I]f they see a rival in their neighborhood, they are going to take . . . violent action." The prosecutor discussed the premeditation element of first degree murder. She explained that "a cold, calculated decision [can] be

5

reached quickly" because the "test is the extent of the reflection, not the length of time." She continued: "A gangster is predisposed to [react] almost [instinctively] without having to really weigh things. They are programmed to attack a rival especially in their turf, especially after this five-minute time period after the phone call comes in because they already have that mindset. A rival is in their turf, they are not going to tolerate it." "Gangsters know encounters with rivals are going to turn violent." "Martinez specifically chose to arm himself with a knife." "Murillo chose to get everyone pumped up, to get everyone motivated. Even [defendant] had to admit they were looking for trouble. They were out gang banging. . . . They chose to hunt for the victim." "Sincox chose to get out [of the van]. He chose to do a hit-up. He chose to reach toward his waistband. [Defendant] chose to take the knife out. Even before he got out of the van. . . . And both [defendant] and Sincox [chose] to punch the victim." "Martinez chose to stab him four times. . . . And we all know a person can die from one stab wound, much less four." "Think of all this in context. Think of it all together. It's your job to see how all the evidence fits together. . . . Gang members are predisposed to using violence against rivals especially when they are on notice, when they are hunting. There's somebody in our neighborhood and we are going to go there and find him."

In discussing the crime of street terrorism and its element that the defendant must have willfully promoted felonious criminal conduct by gang members, she argued: "The law treats gang members differently. The Legislature has carved out these specific laws that are focused on criminal street gangs and that makes absolute sense . . . when you think about the evil they can accomplish as a group in numbers. . . . [W]hen they work together, . . . there's no discussion. There's no game plan, like in a football game where the coach goes to the board and draws the plays on the board and tells you what plays they are going to [call]. That's not needed in this world. They know what's expected of them without discussion so that's why there doesn't need to be a detailed plan. It's understood."

6

Outside the jury's presence, defense counsel later objected that the prosecutor had vouched that murders happen at hit-ups "all the time." Defense counsel further objected that the prosecutor had improperly used gang evidence to prove character and had violated the limited purpose of gang testimony permitted under CALCRIM No. 1403. He argued gang testimony is admissible to show a defendant's intent or knowledge for purposes of gang-related crimes like street terrorism, or to show motive, but not to show whether homicide was committed with premeditation and malice aforethought so as to constitute first degree murder. Defense counsel asked the court to admonish the jury that the prosecutor's statements were improper argument. The court denied the request, citing the following statement from *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053, "Gang testimony was relevant to permit the jury to understand [the defendant's] statement [to the victim concerning the defendant's gang membership], to show intent to steal, to show a motive for the crime, to explain how [the defendant's] statement could induce fear in the victim, and to explain how the two defendants were working together, all of which were factors relevant to defendants' guilt."

Subsequently, in the prosecutor's rebuttal argument, she noted that defense counsel had labeled as "unfair" her comments that the law treats gang members differently. She continued, "I think I was right the first time. There's this law we have aimed at gang members and that's so unfair and don't use this as unfair character evidence. Well, then [defense counsel] tried to compare them to surfers or basketball players who dress alike. Well, that's just not a valid comparison. Those groups weren't organized to commit crime together. [¶] The law recognizes that gangsters can do more evil when acting together. That was the point I was making and I stand by that. The law allows you to use the gang evidence to interpret the facts here and interpret what the intentions were of these people, what their motives were, what their intentions were, to interpret their actions that would otherwise seem senseless and random to an average

7

person.  Does it make sense to walk up to someone and say, where are you from, and then proceed to attack and kill them?"

Unquestionably, gang evidence is inadmissible to prove a defendant has a criminal disposition to commit a particular act.  (Evid. Code, § 1101, subd. (a); *People v. Williams* (1997) 16 Cal.4th 153, 193.)  Under Evidence Code section 1101, subdivision (a), subject to statutory exceptions, "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion."  Nonetheless, evidence that a person committed a crime, civil wrong, or other act is admissible to prove a fact such as motive, intent, plan, or absence of accident.  (*Id.*, subd. (b).)

Defendant does not contest the admissibility of the gang evidence admitted below.  Rather, he challenges the prosecutor's closing arguments informing the jurors of acceptable inferences they could draw from the evidence.  He contends the prosecutor argued that gang members have a propensity to act instinctively and have already premeditated and deliberated as part of their culture, and that this argument violated Evidence Code section 1101 and due process and misrepresented the law.

"""""A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.""""  [Citations.]  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves """"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.""""""  (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*), overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

A prosecutor is subject to limitations on the scope of closing argument and the method of presenting it.  (5 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 757, p. 1178.)  Nonetheless, """""a prosecutor is given wide latitude

8

during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience . . . .'"'" (*Hill*, *supra*, 17 Cal.4th at p. 819.) When a claim of prosecutorial misconduct focuses on the prosecutor's comments to the jury, we must determine whether it is reasonably likely "the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Prosecutorial misconduct requires reversal only if it prejudiced the defendant. "Under traditional application of this state's harmless error rule, the test of prejudice is whether it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. [Citations.]' [Citation.] However, if federal constitutional error is involved, then the burden shifts to the state 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (*People v. Bolton* (1979) 23 Cal.3d 208, 214.)

We find no prejudicial misconduct here. The prosecutor's comments did not rise to the level of misconduct under the federal standard. That is, the argument was not "'"so egregious that it infect[ed] the trial with such unfairness as to make the conviction a denial of due process."'" (*People v. Espinoza* (1992) 3 Cal.4th 806, 820.)

Whether the prosecutor committed misconduct under the state standard is a closer question. Even the Attorney General admits "the prosecutor's word choice was ill-advised given the rule of evidence prohibiting criminal disposition to infer guilt." But the Attorney General continues, "However inartfully articulated, the prosecutor's statements concerning predisposition were related to the gang expert's testimony concerning gang

9

culture and what is expect[ed] of gang members in terms of rivals, defending territory, and maintaining respect."

Viewing the prosecutor's comments in context, we do not find she used deceptive or reprehensible methods to try to persuade the jury. She told the jurors that reflection was required for premeditation and that defendant chose to go hunting for the victim, chose to arm himself with a knife, and chose to stab the victim four times. She told the jurors they could use the gang evidence to help them interpret the facts and defendant's motive and intent. In determining whether it is reasonably likely that the jury understood or applied the complained-of comments in an improper or erroneous manner, "we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) We conclude it is not reasonably likely the jury construed or applied the challenged remarks in an objectionable fashion.

In any case, any error was harmless. The court instructed the jury with CALCRIM No. 1403 as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether a defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes, enhancements or special circumstances allegation as charged or whether a defendant had a motive to commit a crime charged or whether the defendant had a need to defend himself. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence the defendant is a person of bad character or he has a disposition to commit crime."

10

The court further instructed the jury: "You must follow the law as I explain it to you, even if you disagree with it. Now if you think the attorneys' comments on the law conflict with my instructions, follow my instructions."

We must presume the jury followed the court's instructions. (*People v. Osband* (1996) 13 Cal.4th 622, 714-715.) "We must also assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Kegler* (1987) 197 Cal.App.3d 72, 80.) The court's instructions to the jury cured any prosecutorial misconduct.

*The Court Properly Instructed the Jury on Mutual Combat*

At the prosecution's request, and over defendant's objection, the court instructed the jury on the limits of self-defense for a person who engaged in mutual combat or was the initial aggressor. Defendant contends the court erred by giving the instruction because insufficient evidence showed he engaged in mutual combat.

We independently review instructional errors, because they are questions of law. (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1424.) A court must instruct the jury "upon every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) On the other hand, it "is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Such error is subject to the test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, under which "reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*Guiton*, at p. 1130.)

11

The court instructed the jury with CALCRIM No. 3471 as follows: "A person who engages in mutual combat or who is the initial aggressor has the right to self-defense only if . . . [¶] 1. He actually and in good faith tries to stop fighting, and [¶] 2. He indicates by words or conduct to his opponent in a way that a reasonable person would understand that he wants to stop fighting and that he has stopped fighting; and [¶] 3. He gives his opponent a chance to stop fighting. [¶] If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose. [¶] If you decide a defendant started a fight using nondeadly force and the opponent responded with such sudden and deadly force [that] the defendant could not withdraw from the fight, then the defendant had the right to [defend] himself with deadly force and was not required to stop fighting."

Under section 197, homicide is justifiable when committed by a person in lawful self-defense, but if the person "was the assailant or engaged in mutual combat, [he] must really and in good faith have endeavored to decline any further struggle before the homicide was committed." A person who voluntarily engages in mutual combat must try to withdraw from it before he or she is justified in killing an adversary in self-defense. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045 (*Ross*).) "'Mutual combat'" for purposes of self-defense as a defense to homicide does not mean simply any violent struggle or "reciprocal exchange of blows." (*Ibid.*) Rather, it is a "'fight begun or continued by mutual consent or agreement, express or implied.'" (*Ibid.*, italics omitted.) Thus, in order for the mutual combat doctrine to apply, "there must be evidence from which the jury could reasonably find that both combatants actually consented or intended to fight before the claimed occasion for self-defense arose." (*Id*. at p. 1047, italics omitted.)

12

In *Ross*, the court held the trial court erred by instructing the jury on mutual combat (*Ross*, *supra*, 155 Cal.App.4th at pp. 1042-1043 & fn. 9, 1049, 1054) where "the evidence strongly suggests that the parties exchanged contemptuous remarks until [the victim] lost her temper and slapped defendant, whereupon he punched her back" (*id.* at p. 1054). The prejudicial error in *Ross*, however, was the court's failure to define "mutual combat" for the jury. (*Id.* at pp. 1049, 1054-1056.) The jury instruction given in *Ross* contained no definition of mutual combat (*id.* at pp. 1042-1043), yet "the court refused the jury's request during deliberations for a legal definition of 'mutual combat,' telling jurors instead to rely on the ordinary meaning of those words. This left the jury free to suppose that any exchange of blows disqualifies both participants from claiming a right of self-defense." (*Id.* at p. 1036.)

*Ross* acknowledged that "[d]etermining what constitutes mutual combat in the setting of a gang battle or war may present unique difficulties. ([Citations.] ['"there was sufficient evidence to support a jury finding that rival groups tacitly agreed, pursuant to an 'unwritten code of macho honor,' that there would be mutual combat and that each group aided, abetted and encouraged its adversary to engage in urban warfare"'].)" (*Ross*, *supra*, 155 Cal.App.4th at p. 1046, fn. 16.) In *People v. Quach* (2004) 116 Cal.App.4th 294, a case involving a gun fight between gang members (*id.* at pp. 297-298), this court found the jury "could quite reasonably have concluded this was a mutual combat situation" (*id.* at pp. 300-301).

Defendant contends no substantial evidence showed any mutual prearrangement to fight in this case. He further argues no substantial evidence showed he was the initial aggressor.

Defendant is wrong on both counts. The evidence showed that Cruz, a member of a rival gang, was present in Fifth Street territory. Typically, a gang will try to protect its claimed turf in order to maintain its reputation, money-making operations, and territory boundaries. When defendant and his companions learned of a trespasser in their

territory, they went looking for him, intending to gang bang and smash. They exchanged gang signs and/or slogans with Cruz. Defendant and Sincox hit-up Cruz. Cruz reached into his waistband. A fight ensued. From this evidence, the jury could find defendant and Cruz impliedly mutually consented to fight. This was not a sudden, unexpected explosion of violence, as in *Ross*.

Furthermore, the record contains substantial evidence that defendant and Sincox were the initial aggressors. Although defendant testified otherwise, questions of credibility were for the jury to decide. Due to the evidence defendant was an initial aggressor, the jury may not have even reached the "mutual combat" issue and the third requirement of giving the opponent a chance to stop fighting.

*Defendant Was Not Prejudiced by an Officer's Testimony about Sincox's Letter*

Defendant contends he was prejudiced by an officer's testimony concerning a statement about him in Sincox's jail letter — evidence the court had already ruled inadmissible in an in limine ruling. Sincox wrote the letter to his brother. The letter stated that Sincox and defendant would "take care of" Miramontes when they saw him. The People sought to have the officer testify about the letter. The court ruled the officer could testify about Sincox's statement that he (Sincox) would take care of Miramontes, but was precluded from mentioning defendant. But the officer violated the court's ruling by testifying before the jury that Sincox said he and defendant would take care of Miramontes. The court immediately admonished the jury: "Ladies and gentlemen, I'm going to instruct you to disregard the last answer and not consider it for any purpose. [¶] And, Ms. [prosecutor], I need to advise you of the importance of apprising your witnesses regarding the court's rulings. Once again, ladies and gentlemen, disregard the last answer and do not consider it for any purpose." The prosecutor then asked for a pause in the proceedings to talk with her witness. The court replied, "Yes. Do you want to take the witness to the woodshed — I mean to the hallway?" The court subsequently declined to

14

find the officer acted in bad faith, but noted the jury must have realized from the court's reference to the woodshed that the court was displeased with the way the prosecutor and her witness handled the topic.

"'A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith. [Citations.] It is only in the exceptional case that "the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions."'" ( *People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1404.) This is not an exceptional case. Defendant suffered no prejudice.

*The Court Properly Imposed a 10-year Gang Enhancement on Count 1*

Relying on *People v. Lopez* (2005) 34 Cal.4th 1002, defendant argues the court was required to impose the 15-year minimum parole eligibility requirement mandated by section 186.22, subdivision (b)(5), in lieu of the 10-year gang enhancement under section 186.22, subdivision (b)(1)(C). The 10-year gang enhancement generally does not apply to offenses punishable by life in state prison, either as "a straight life term" or as "a term expressed as years to life . . . ." (*Lopez*, at p. 1007.) But *Lopez* distinguished life without the possibility of parole sentences: "[A]t the time the STEP Act [(the California Street Terrorism Enforcement and Prevention Act, § 186.20 et seq.)] was enacted, the predecessor to section 186.22[, subdivision (b)(5)] was understood to apply to *all* lifers, *except those sentenced to life without the possibility of parole*." (*Id.* at p. 1011, second italics added.) Thus, the 10-year enhancement properly applied to defendant's murder conviction. The court properly imposed (and stayed) the 10-year term.

*Execution of Sentence on Street Terrorism Must Be Stayed*

The parties agree execution of sentence on the street terrorism conviction must be stayed pursuant to section 654. Defendant cannot suffer multiple punishments for street terrorism and the underlying felony he willfully promoted. (*Ibid.*; *People v. Mesa* (2012) 54 Cal.4th 191, 197-198.)

## DISPOSITION

The judgment is modified to stay the four-year sentence for the street terrorism conviction. The court is directed to prepare an amended abstract of judgment accordingly and forward a certified copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

16