Filed 5/8/14  P. v. Gidding CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ANTHONY GIDDING,<br><br>    Defendant and Appellant. | H038175<br>(San Benito County<br>Super. Ct. No. CR0901072) |

Defendant Robert Anthony Gidding was convicted by jury trial of robbery (Pen. Code, §§ 211, 212, subd. (a)),[1] first degree burglary (§§ 459, 460, subd. (a)), three counts of false imprisonment (§§ 236, 237, subd. (a)), and assault with a firearm (§ 245, subd. (a)(2)).  The jury also found true allegations that he was armed with a firearm (§ 12022, subd. (a)(1)) in the commission of the robbery, burglary, and false imprisonment counts, that he acted in concert and entered a structure in the commission of the robbery (§ 213, subd. (a)(1)(A)), and that a non-accomplice was present in the residence during the burglary (§ 462, subd. (a)).  Defendant admitted that he had suffered prior convictions and served a prison term for them (§ 667.5, subd. (b)), and the court found true that one of his prior convictions was a strike (§ 667, subds. (b)-(i)) and a

---

[1]    Subsequent statutory references are to the Penal Code unless otherwise specified.

serious felony (§ 667, subd. (a)). Defendant was committed to state prison for a term of 23 years.

On appeal, defendant contends that (1) there was insufficient evidence to support one of the false imprisonment counts, (2) the trial court erred in refusing to admit additional portions of defendant's jail telephone conversations under Evidence Code section 356, (3) the prosecutor committed prejudicial misconduct, (4) the superior court erred in denying his *Pitchess*[2] motion, (5) the errors were cumulatively prejudicial, and (6) the trial court violated section 654 by imposing separate punishments for the robbery count, one of the false imprisonment counts, and the assault count because these counts were against the same victim and were part of the same course of conduct. We conclude that the trial court violated section 654 when it imposed a separate sentence for the assault count, but we reject the remainder of defendant's contentions.

## I. Factual Background

Roberta Anna Mendoza, her boyfriend Francisco Rodriguez Hernandez (Rodriguez), and her son Romero Enrique Castillo lived near Bixby Road at 2560 San Juan Road, which is also known as Highway 156. Shortly after midnight on May 31, 2009, Mendoza was awakened by a "heavy knock" on her front door. The bed in which Mendoza and Rodriguez were sleeping was pushed up against the front door. Mendoza looked out the window and saw a man outside dressed in black and wearing a beanie. She also saw a "long, wide, spooky, ugly looking," "big vehicle" outside her home. Mendoza later that night identified defendant's car as the one she had seen outside her home. She unsuccessfully tried to awaken Rodriguez. Mendoza ran to another room and looked out another window. From this window, she could see that there were four or five men outside her home, all of them dressed in black. She believed the men were

---

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

Hispanic based on their clothing although she could not see their skin.  Mendoza went to Castillo's room and told him to get up and call the police.

One of the men went around the back of the house and removed a window screen. Before Castillo could call the police, one of the men kicked the front door open, shoving back the bed in which Rodriguez was sleeping.  One of the men fell on top of Rodriguez, and Rodriguez began struggling with him.  This man was "Mexican."  A second man hit Rodriguez in the head with the butt of a pistol.[3]  One of the men tied Rodriguez up with a plastic zip-tie, and the Mexican man told Rodriguez in Spanish not to move and not to look at any of the other men.  He shined a bright light in Rodriguez's eyes the entire time the men were there, so Rodriguez did not see any of the men besides the Mexican one. The other men were speaking English.

Mendoza heard a loud crash and a voice speaking English and saying "Don't move."  She also heard voices telling Castillo to put down the phone and lie down on the floor or he would be shot.  Castillo obeyed this order.  The men tied his hands behind his back with a plastic zip-tie and left him on the floor face-down.  One of the men repeatedly asked Castillo in English where the "money" and "valuables" could be found. Castillo repeatedly responded that they had no money or valuables.  Castillo could hear a man talking to Rodriguez in Spanish.  The men asked Castillo who else was in the house, and he told them that his mother was there.

Mendoza, who was "[a]ll curled up" hiding in a storage room, was "scared."  She feared for her life.  She heard one of the men yelling "[w]here the fuck is she?"  The men proceeded to go through the house with flashlights looking for her.  They looked in the storage room, but they did not discover her.  The men took $80 out of Rodriguez's wallet,

---

[3]     Rodriguez had two "bumps" on his head from being hit with the pistol butt, and his jaw was also injured in the struggle.

took his cell phone, and left. A few minutes later, at 12:24 a.m., Castillo called the sheriff's department.

Deputy Sheriffs Richard Uribe and Mark Williams were promptly dispatched to 2560 San Juan *Hollister* Road. San Juan Hollister Road is a frontage road that parallels a portion of San Juan Road/Highway 156 that is not near Mendoza's home. Unfortunately, the deputies were not told that the cross street for Mendoza's home was Bixby. Instead, they were directed to a different cross street near the "wrecking yard," which is on San Juan Hollister Road, not on Highway 156. This was four or five miles away from Mendoza's home. When Uribe was unable to find the address 2560 on San Juan Hollister Road, he got out of his patrol car to check mailboxes near 2620 San Juan Hollister Road. Williams joined him. They were both in full uniform and carrying rifles.

The deputies could not find 2560, but Uribe saw "four to five silhouettes of people running" by a driveway near 2620 San Juan Hollister Road. Uribe called out "Sheriff's office, Stop." They did not stop. Additional uniformed deputies arrived, and one of the deputies illuminated the area with a spotlight. A minute or two later, Uribe saw Joaquin McKenzie, a Hispanic male wearing black clothing, walking up the driveway toward him. Uribe ordered McKenzie to stop, and he did. One of the other deputies handcuffed McKenzie and put him in a patrol car.

Less than a minute later, Uribe and the other deputies saw defendant's car coming very slowly up the driveway. One of the patrol cars was partially blocking the driveway. Williams recognized defendant as the driver and called out this information to the others. Williams, who was just a few feet from defendant's car, yelled "Sheriff's office, Stop, Sheriff's office, Stop." Uribe walked toward the car while identifying himself as "sheriff's office" and illuminating the inside of the car with his rifle's light. Defendant did not stop the car but instead suddenly accelerated toward Uribe.

Williams realized that Uribe and the other deputies were in the car's path, and he started firing his rifle at defendant. Uribe tried to get out of the way of defendant's car.

4

When it was 10 feet from him, he fired two rounds from his rifle at the car's windshield. He fired four more rounds, targeting the front tires, before defendant's car turned eastbound on San Juan Hollister Road. Uribe heard the vehicle "bottom[ ] out" because the right front tire was "blown." He fired two more rounds at the back of the vehicle hoping to disable it. Uribe took custody of McKenzie, and two of the other deputies pursued defendant's car.

The deputies who remained at the scene of the shooting saw another car drive up the driveway. The occupants of this car, Stan Helmhout and Kathleen Austin, were briefly detained. They were released after it was determined that they were not involved in the incident. Defendant's car was soon found nearby, disabled and abandoned in the middle of the road. The entire car, including the chrome trim and the license plate, had been spray painted a "dull primered" black. Two weeks earlier, defendant's car had been stopped for expired registration tags, and his license plate had not been painted black at that time. Black plastic zip-ties were found inside the car, but they were not as long as the ones used to tie up Castillo and Rodriguez.

Eventually, sheriff's deputies arrived at Mendoza's home. None of the victims was able to describe the men who had invaded Mendoza's home.

The sheriff's department issued a flyer with defendant's photo on it to law enforcement officers in the surrounding area. A Hollister police officer responding the morning after the home invasion to a report of a suspicious person found defendant sitting on a bench. He was wearing a black shirt, a black hooded sweatshirt, and black jeans, and he had a bloody wound on his head. The officer asked defendant about the wound, and defendant said he had gotten into a fight with his girlfriend, whom he refused to identify. Defendant was arrested. After his arrest, defendant said that he would "talk about the two events and the people involved" if the charges were changed to misdemeanors. His offer was declined. Defendant also inquired about McKenzie. A

5

few days later, a beanie and a pair of gloves plus a single glove were discovered near the scene of the shooting.

After defendant was arrested, he telephoned McKenzie from jail. The phone call was recorded. Defendant told McKenzie: "All you have to do is go to talk to Stan, and tell Stan that me and you were fucking there. Just have Stan say yeah they, they've been with . . . they were there for fucking hours before . . . for fucking 3 or 4 hours right there at Stan's house." McKenzie told defendant that Stan was "being kind of fucking bitched up or something I don't know." Defendant responded: "Just go over with a fucking chunk of cash." "Yeah you need to go talk to him like right fucking now, please." "Like jump in your car and go explain to him that me and you had been with him for like 3 or 4 hours before the cops showed up." "Let Stan know that I need him to say that I had been parked there for like 3 hours." "Please. And my car was parked there for 3 hours, and whatever fucking old car they're talking about, old black car that was involved in home invasion, then that will be clear, because obviously it wasn't mine. As long as Stan will say nah, he's been fuckin', he's been here for 3 hours." McKenzie later spoke with defendant and reported: "Stan said that you were over there smoking cigarettes for about three hours with him." Defendant responded: "Fuck yeah!"

Defendant also called his mother from jail. He told her that "they're telling me that there was an old black car involved in a uh robbing a house. Armed robbery . . . assault robbery or whatever. Like somebody robbed a house with guns." His mother asked "An armed robbery?" He replied "Yeah. No, that's not what the charge is. It's uh, home invasion." No one had mentioned guns to defendant at the time of his arrest. He had initially been charged with attempted murder (with his car), robbery, and conspiracy.

6

## II. Procedural Background

Helmhout testified at trial that he was awakened on May 31, 2009 after midnight by loud noises outside his home at 2626 San Juan Hollister Road, which was on the same driveway where the shooting took place. He opened the door and saw three Hispanic men. One of the men was at Helmhout's door begging to be let inside. The man called Helmhout "Stan." Helmhout thought he had met two of the men once before, but he did not know their names. Helmhout refused to admit the man at the door and slammed the door. When Helmhout continued to hear noises outside, he reopened the door, and the men tried to force their way inside. Helmhout managed to close the door. Defendant was not one of the men. Helmhout heard someone on the roof of his home, and he heard gunshots. This made Helmhout nervous, so he and Austin got into his truck and drove up the driveway until they encountered the sheriff's deputies.

The following day, one of the men who had come to Helmhout's door returned and asked for permission to retrieve his cell phone and a gun that he had dropped in some nearby bushes. The man retrieved two items, including a cell phone, from the bushes. Subsequently, Helmhout was visited by a man who asked him to falsely say that defendant was "at my place playing cards" on the night of the shooting. Defendant was Helmhout's friend. Helmhout told the man that he would do so, but he later changed his mind because he "didn't want to get involved."

The jury found defendant guilty of all of the substantive counts and found the associated allegations true. Defendant admitted that he had suffered the prior conviction alleged to be a prior serious felony and strike and admitted the prison prior, but he did not admit that the prior conviction qualified as a strike or as a serious felony conviction. The court found that it did, and it denied defendant's motion to strike the strike. The court also denied defendant's motion for a new trial. Defendant was committed to state prison for a term of 23 years, which included consecutive sentences for the robbery, false imprisonment, and assault counts. Defendant timely filed a notice of appeal.

7

### III.  Discussion

### A.  Sufficiency of the Evidence

"The role of an appellate court in reviewing the sufficiency of the evidence is limited.  The court must 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citations.]  [¶]  The same standard applies to the review of circumstantial evidence.  [Citation.]  The court must consider the evidence and all logical inferences from that evidence . . . .  But it is the [factfinder], not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt.  [Citation.]  Therefore, an appellate court may not substitute its judgment for that of the [factfinder].  If the circumstances reasonably justify the [factfinder]'s findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding."  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138-1139.)

Defendant challenges the sufficiency of the evidence to support his conviction for falsely imprisoning Mendoza.  He claims that the required "general intent" was lacking because the robbers "had no contact whatsoever" with Mendoza and did not know of her presence in the house.

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.)  False imprisonment is a felony where it is "effected by violence, menace, fraud, or deceit."  (§ 237, subd. (a).)  "[F]elony false imprisonment requires only general criminal intent; that is, the defendant must intend to commit an act, the natural, probable and foreseeable consequence of which is the nonconsensual confinement of another person . . . ."  (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1399-1400.)

The natural, probable and foreseeable consequence of the robbers' acts was that Mendoza would be nonconsensually confined.  The robbers forced open the front door of

8

her home in the middle of the night. They loudly threatened to shoot her son if he moved and forced him to reveal her presence. After Castillo told the robbers that his mother was in the house, the robbers loudly and visibly searched the small house for her. Since one robber had gone around the back of the house and the rest had entered from the front, they were aware of the size of the home and of its only exits. It was natural and foreseeable that Mendoza, hearing that her presence was known to the robbers and that they had threatened to shoot her son if he moved, would be forced to remain hidden in fear that she would be found and shot.

This evidence readily established that the robbers had the requisite general intent to falsely imprison Mendoza. Since the robbers knew of her presence, sought her out, and loudly threatened her son's life if he moved, they were plainly conscious of the nature of their acts and of the probable consequences for Castillo's unseen but present mother. (*People v. Fernandez* (1994) 26 Cal.App.4th 710, 718.) The evidence supports the jury's verdict on this count.

### B. Jail Calls

Defendant contends that the trial court erred in excluding the remainder of his jail phone conversations with McKenzie and his mother. He claims that these conversations were admissible in their entirety under Evidence Code section 356.

### 1. Background

Defendant made a pretrial motion seeking admission of the remainder of his jail calls, given that the prosecution intended to introduce excerpts from those calls. He claimed that the entirety of the calls was required to be admitted under Evidence Code section 356 "to place all the calls in context, particular[ly] with regard to defendant's conversation concerning the police shooting at him and almost killing him." The prosecution countered with a motion to exclude all statements by defendant. The defense subsequently made an in limine motion to preclude the prosecution from introducing any

9

part of the jail calls. The in limine motion also argued that the introduction of any part of the jail calls would entitle the defense to introduce the entirety of the calls under Evidence Code section 356.

At a hearing on the defense motion to exclude the prosecution's excerpts, the defense claimed that the entirety of the calls would be admissible to show defendant's "emotional state." The court did not immediately rule on the issue. Instead, the court proceeded to consider the parties' arguments about the admissibility of defendant's statement to his parole officer.

The prosecutor sought admission of defendant's statement to his parole officer that he was at the shooting. The defense sought admission of defendant's statement to his parole officer that he was not at the home invasion. The court ruled that the admission that he was at the shooting could come in but the denial that he was at the home invasion could not. "Clearly that first part of the sentence is an admission: I was at the shooting. But not at the home invasion. That's not an admission. That's an exculpatory statement. That's not subject to an exception to the hearsay rule." Defendant's trial counsel did not contend that Evidence Code section 356 applied to the statement to the parole officer. Instead, he argued that this statement was admissible as a business record or as a statement against penal interest. The court rejected those claims. The court did not make any ruling on the jail calls at that time, saying it needed "a little more clarity" on that issue. "I will not rule on it now because I haven't read it . . . ."

At a subsequent in limine hearing, the court concluded that Evidence Code section 356 did not require the admission of any additional portions of the jail calls sought by the defense. "[O]bviously, the whole area that deals with that [(what the prosecution was introducing)] should come in to give it meaning. [¶] But I don't think, just because something is relevant, that the whole transcript comes in or ten paragraphs surrounding the relevant parts. If there needs to be some clarification, yes. But I don't think there

10

needs to be any clarification here. What he says is self-contained and clear." The prosecution was thereafter permitted to play for the jury brief excerpts from the jail calls.

## 2. Analysis

Defendant begins by claiming that the trial court's ruling was erroneously founded on its belief that the issue "involv[ed] the distinction between an admission and an exculpatory statement." He misreads the record. The court's statement about the distinction between an admission and an exculpatory statement did not concern the jail calls but the parole officer's statements. The court's ruling on the jail calls was made at a different hearing and on a different basis.

Defendant's primary contention on appeal is that additional portions of the jail calls were admissible under Evidence Code section 356. "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." (Evid. Code, § 356.) Because the defense sought admission into evidence of additional portions of the conversations under Evidence Code section 356, it was required to show that the additional portions were "necessary to make [the prosecution's excerpts] understood . . . ."

"The purpose of Evidence Code section 356 is to avoid creating a misleading impression. [Citation.] It applies only to statements that have some bearing upon, or connection with, the portion of the conversation originally introduced. [Citation.] Statements pertaining to other matters may be excluded." (*People v. Samuels* (2005) 36 Cal.4th 96, 130.) "Section 356 is indisputably '"subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced."' [Citations.] 'The rule is not applied mechanically to permit the whole of a transaction to come in without regard to its competency or relevancy . . . .'"

11

(*People v. Williams* (1975) 13 Cal.3d 559, 565.)  An additional portion of a conversation "may be excluded at the court's discretion if it does not serve to clarify or explain" the portion introduced by the adverse party.  (*People v. Von Villas* (1992) 10 Cal.App.4th 201, 272 (*Von Villas*).)  We review the trial court's ruling on the admissibility under Evidence Code section 356 of additional portions of the jail calls for abuse of discretion.  (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274.)

Defendant argues that the trial court's ruling was an abuse of discretion because the court's reasoning relied on the lack of a need for clarification instead of the relevancy of the omitted portions.  We find no error in the trial court's reasoning.  Evidence Code section 356 permits the introduction of additional portions of a conversation only where the additional portions are shown to be "necessary to make [the admitted portions] understood . . . ."  (Evid. Code, § 356.)  The trial court may exclude additional portions if the additional portions do not "serve to clarify or explain" the admitted portions.  (*Von Villas*, *supra*, 10 Cal.App.4th at p. 272.)  Thus, the lack of a need for clarification is a valid basis for excluding evidence sought to be admitted under Evidence Code section 356.

The only remaining question is whether the defense established that the prosecution's excerpts from the jail calls required clarification.  The first excerpt was defendant telling McKenzie that he "would have stopped if I would have known it was the fucking cops."  The second and third excerpts were the conversation between defendant and McKenzie about McKenzie getting Helmhout to provide an alibi for defendant and McKenzie.  The fourth excerpt was defendant's conversation with his mother in which he revealed knowledge that the home invasion had involved guns and "an old black car" and told his mother about his alibi.  The fifth excerpt was defendant's conversation with his mother in which he told her that the "Mexicans" who had committed the home invasion had been "running all around me" "with guns" in the driveway before he drove away in his black car.  The final excerpt was the conversation

between McKenzie and defendant in which McKenzie told defendant that he had gotten Helmhout to provide an alibi, and defendant replied "Fuck yeah!"

Defendant claims that the exclusion of the remainder of the conversations "created a false impression by removing the statements from their context." As to the first excerpt, he claims that his statement that he did not know it was the police when he failed to stop his car needed to be clarified with his statements providing more detail about *why* he did not think that it was the police. Defendant is under the mistaken impression that this excerpt was admitted to show his consciousness of guilt. Not so. It was admitted to show that defendant was the driver of the car, which was relevant to his connection to the home invasion as the car was identified by Mendoza as having been outside her home during the home invasion. The trial court could have reasonably concluded that defendant's alleged basis for his alleged lack of knowledge of the deputies' identities was not necessary to give meaning to his admission that he was driving the car.

Defendant contends that the remainder of the excerpts from his conversation with McKenzie needed to be supplemented with additional portions of the conversation in which he complained about the lengthy sentence he faced. In his view, the omitted portions would have clarified that he was not seeking an alibi because he was guilty but because he feared a lengthy sentence. The trial court did not abuse its discretion in concluding that the prosecution's excerpts showing that defendant had made efforts to produce a false alibi did not require clarification. The admission of defendant's statement that he feared a lengthy prison term would not have shown that he was *not* trying to concoct a false alibi nor would it have clarified the nature of his attempt to create a false alibi.

Finally, defendant claims that additional portions of his conversation with his mother were necessary to clarify the excerpts introduced by the prosecution. The prosecution's excerpts were limited to showing that defendant knew that the home invasion had been committed by "Mexicans" with guns and had involved an "old black

13

car." The trial court could reasonably conclude that defendant's additional statements to his mother about the shooting, the charges and prison sentence he was facing, and his alibi would have done nothing to clarify his knowledge of the connection between Mexicans, guns, an "old black car," and the home invasion, knowledge that only one of the perpetrators would have had.

Because the excerpts introduced by the prosecution were narrow and did not involve the subject matter that was discussed in the remainder of the conversations, the trial court did not abuse its discretion in rejecting admission of the remaining portions of the jail calls under Evidence Code section 356.

### C. Prosecutorial Misconduct

Defendant contends that the prosecutor committed prejudicial misconduct that warrants reversal of the judgment.

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action '"so infected the trial with unfairness as to make the resulting conviction a denial of due process."'" (*People v. Rundle* (2008) 43 Cal.4th 76, 157, disapproved on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) It is only where the trial is fundamentally unfair that we evaluate any error under the federal standard; otherwise, we apply the state law harmless error standard of review. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514-515.) Under the state law standard, reversal is required "only if, 'after an

14

examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred (*Watson*, *supra*, 46 Cal.2d 818, 836)." (*People v. Breverman* (1998) 19 Cal.4th 142, 178.)

Defendant accuses the prosecutor of improper "vouching." At the beginning of his opening argument to the jury, the prosecutor said: "You know, I got the greatest job in the world. How many people can say my job is to do justice. That's my job. You were picked and you're on this jury to help do that very thing, justice." He began his closing argument with the following: "The burden is mine. I'm not trying to shift the burden. This is about doing justice." Later, he said; "There's an old adage -- I'm a big boy. Seems like I'm a little upset here. I'm a little worked up. I apologize. I don't like to be personally attacked. It's part of the job. I did defense work for many years myself before I came here. [¶] There's an old adage. If the facts are against you, attack the law. If the law is against you, attack the facts. If the facts and the law are against you, attack the cops, attack the prosecutor, attack anybody you can. That's all they did." "Think about the stuff that he says. Listen. Because he wants to confuse you. He's just doing his job. I'm not going to put him down or call him a liar or throw stones at him or dispute his integrity like he did to me. I don't need to do that because I have the facts of this case and the law on my side and on the People's side."

Defendant asserts that the prosecutor's comments to the jury about his job being to "do justice" and his remarks about the "old adage" were prohibited vouching.[4]

---

[4] Defendant also asserts that the prosecutor's references to defendant's trial counsel's argument that the robbers were "Mexicans" or "Hispanics" was somehow an attack on defendant's trial counsel's integrity. We disagree. These remarks, and others he mentions in this regard, were closely tied to the prosecutor's argument that the jury should be guided by the evidence. These remarks were not improper, and we cannot imagine how the jury could have seen them as attacks on defendant's trial counsel's integrity.

"Impermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness."'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.) "When, as here, the claim focuses on comments made by the prosecutor before the jury, a court must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror. [Citations.] If the remarks would have been taken by a juror to state or imply nothing harmful, they obviously cannot be deemed objectionable." (*People v. Benson* (1990) 52 Cal.3d 754, 793.)

While some of the prosecutor's words were poorly chosen, he did not ask the jury to disregard the evidence and instead rely on the prestige of his office in deciding the case. The prosecutor's remarks about his job being to "do justice" were not connected to any exhortation that the jury should believe the prosecution's witnesses or find defendant guilty based on anything other than the evidence. Instead, these remarks were general and amorphous. No reasonable juror would have viewed these remarks as implying anything harmful to defendant. As to the "old adage" remarks, in *People v. Breaux* (1991) 1 Cal.4th 281 (*Breaux*), the California Supreme Court found similar remarks were not improper so long as they did not suggest that defense counsel was permitted to be dishonest but only that the jury should rely on the evidence. (*Breaux*, at p. 306.) As in *Breaux*, the prosecutor accused the defense of trying to "confuse" the jury, but the thrust of his remarks was that the jury should focus on the facts and the law and ignore the quibbles between the attorneys. Indeed, the prosecutor explicitly told the jury that defendant's trial counsel was "just doing his job" and asserted that he was not calling

16

defendant's trial counsel "a liar" or disputing his "integrity."[5] We are satisfied that the jury would not have understood the prosecutor to be impugning the integrity of defendant's trial counsel.

Defendant maintains that the prosecutor relied on matters outside the record when he argued to the jury: "I'll just let you realize this -- and I know that you probably do -- the defense didn't want [the jail calls] to come in. I'm sure. You think he wants you to know all those statements he made." We agree that these remarks were improper as the defense's position on the admissibility of the jail calls was both not in evidence and irrelevant. However, we see no possibility of prejudice. The prosecutor's point was that defendant's concoction of an alibi was damaging to his defense. It is inconceivable that the jury would not have reached that same conclusion in the absence of the prosecutor's inappropriate comments.

Defendant asserts that the prosecutor made an argument to the jury that was an attempt to shift the burden to the defense. The prosecutor argued that defendant was one of the robbers and "was there" at the home invasion. He also argued that, even if defendant only "drove them there," he was still guilty as an aider and abettor. "He knew where they were going and what they were going to do. He knew what his car was designed to do. Now, as I said, that's just a fallback because he was there. There's no evidence that he wasn't." Defendant claims that this last sentence was an attempt to shift the burden to the defense. We agree that this remark was improper. But the record does not reflect that the jury would have understood this isolated remark to encourage it to shift the burden to the defense. The prosecutor explicitly told the jury, after this remark, that "[t]he burden is mine. I'm not trying to shift the burden." After arguments, the court

---

[5]     Defendant complains that these statements by the prosecutor were an example of "a rhetorical device in which the statement suggests the opposite of its explicit meaning." We find no basis in the record for a conclusion that the jury would have understood the prosecutor to mean the opposite of what he said.

17

explicitly instructed the jury that the prosecutor bore the burden of proof and told the jury to follow the court's instructions and disregard anything contrary said by the attorneys. Under these circumstances, the jury could not have understood the prosecutor's remark to authorize it to shift the burden to the defense.

Defendant contends that the prosecutor improperly asked the jurors to put themselves in the positions of the victims. The prosecutor argued to the jury that the victims were credible because they had always been consistent, including on cross-examination. "They didn't waiver [*sic*]. Imagine if you were the victims, the lay people in this whole thing. How tough it was to sit in front of somebody you thought did something that brutal to you and testify. You saw Ms. Mendoza break down a little bit. I think Mr. Castillo did too. [¶] Why would they come forward and why would they put themselves through this? This happened the way they said it did."[6] The prosecutor's point was that the victims' emotional responses and consistency during their testimony supported their credibility. While his "[i]magine if you were the victims" comment was improper, the jury would not have understood this remark, in context, as asking them to place themselves in the victims' shoes but simply as pointing out that the victims' demeanor in court demonstrated their credibility not the opposite.

Defendant also argues that the prosecutor engaged in "badgering and abusive behavior" toward defendant's trial counsel that constituted misconduct and rendered the trial fundamentally unfair. He concedes that much of this conduct occurred outside the jury's presence, but he argues that even that conduct infected the trial proceedings with

---

[6]    The prosecutor made a similar comment in his rebuttal argument when he was again defending Mendoza's credibility. "He's going to sit here and say, How could she, why would she -- how would you feel? This poor woman was robbed in her own house." The substance of this comment asked the jury to view Mendoza's demeanor while testifying in the context of the trauma that she was required to remember. It did not ask the jurors to see themselves as the victims of the crimes.

18

unfairness.  We disagree with the premise.  The prosecutor did indeed make comments outside the presence of the jury that were intemperate, but none of those comments infected the proceedings with any unfairness because the trial court maintained control of the proceedings at all time.  As the trial court noted at the hearing on the motion for a new trial in connection with the defense claims of prosecutorial misconduct:  "Both sides made some comments that, in retrospect, probably should have been modified slightly, but none of it amounted to prosecutorial misconduct, and none of it impaired a fair trial in the case."[7]  We agree.

Defendant also challenges as misconduct some of the prosecutor's interjections in front of the jury.  During defendant's trial counsel's cross-examination of Mendoza, he repeatedly asked her to estimate how much time passed between the men leaving the house and Castillo's call to the police.  Mendoza repeatedly stated that she was unable to say.  After several questions, the prosecutor interjected:  "That's been asked a few times, Your Honor.  She's really struggling with it."  The court overruled the objection.  Moments later, defendant's trial counsel asked Mendoza to look at a transcript to see if it refreshed her recollection.  The prosecutor interjected:  "I'm going to object for a sec.  Can we clarify for the witness that it is a transcription by the defense.  I've had no opportunities to --"  The court responded:  "Let's not get into that.  I think she understands that it's purported to be a transcript . . . ."  The prosecutor replied:  "That's more accurate.  It's purported be a transcript of the . . . ."  Later in defendant's trial counsel's cross-examination of Mendoza, the prosecutor again intervened when

---

[7]     Later in the hearing on the new trial motion, the prosecutor, defendant's trial cocounsel, and defendant began talking at the same time.  The prosecutor said:  "I'm speaking to the court now.  Whether it's one year or 23 years of experience, you should know to shut up and let the other person speak."  Defendant's trial cocounsel responded with a comment about "civility," and the trial court said "stop it right now."  This exchange is demonstrative of the trial court's control of the proceedings.

defendant's trial counsel was asking Mendoza whether she had made certain statements during the 911 call.  The prosecutor said:  "My objection, I kind of let it go for a while, but he's really just testifying as to what he thinks the evidence should be.  He laid no foundation with her, et cetera."  The court overruled the objection.  None of these interjections amounted to misconduct.  The prosecutor's colloquial style was inappropriate, but the trial court intervened in each instance and overruled his objections.

The same is true as to other instances that defendant asserts constituted misconduct.  During the prosecutor's direct examination of the sheriff's deputy who had interviewed the victims, the following colloquy occurred.  "Q.  You say there was a light being shined in his eyes?  [¶]  A.  Yes, there was a flashlight or some type of light.  [¶] MR. VERTNER [defendant's trial counsel]:  Your Honor, this is direct examination.  [¶] THE COURT:  It's leading.  [¶]  MR. PALACIOS [the prosecutor]:  Sorry, Your Honor. [¶]  THE COURT:  Be careful of the leading.  [¶]  MR. PALACIOS:  Sure, Your Honor. I just wanted to save some time."  This exchange again demonstrates that the prosecutor was prone to colloquial interjections, but it does nothing to demonstrate misconduct.

We find no significant misconduct that could possibly have prejudiced the defense.

### D. *Pitchess* Motion

Defendant asks us to examine the reporter's transcript of the superior court's review of Uribe's personnel record to determine whether the superior court erred in denying his *Pitchess* motion.  Because the appellate record lacked a transcript of that review, we asked the superior court to prepare a settled statement regarding its review.  It has done so, and we have reviewed that record, which is fully adequate to afford meaningful review.  The superior court did not err in denying defendant's motion.

20

## E. Cumulative Prejudice

The prosecutorial misconduct was neither individually nor cumulatively prejudicial.

## F. Section 654

Rodriguez was the victim of the robbery count, the assault count, and one of the false imprisonment counts. The court imposed separate terms for the assault and false imprisonment counts consecutive to the term for the robbery count. Defendant claims that the court violated section 654 in doing so because all three counts were committed with the same intent and objective.

"The initial inquiry in any section 654 application is to ascertain the defendant's objective and intent. If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.) "'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]'" (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) "A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

Ordinarily, section 654 precludes the imposition of separate punishment for an assault that is incidental to the perpetration of a robbery. (*People v. Ridley* (1965) 63 Cal.2d 671, 678.) However, "a separate act of violence against an unresisting victim or witness, whether gratuitous or to facilitate escape or to avoid prosecution, may be found not incidental to robbery for purposes of section 654." (*People v. Nguyen* (1988) 204

Cal.App.3d 181, 193.) Here, the robbery, the assault, and the false imprisonment were acts of violence against Rodriguez, but the facts do not reflect that he was an "unresisting victim." Rodriguez testified that he was struggling with a robber who was on top of him when another robber hit him in the head with the gun, and one of them then tied him up. The first man shined a bright light in Rodriguez's eyes the entire time the men were there so that Rodriguez would not be able to identify the robbers.

Substantial evidence supports the trial court's implied finding that the robbery and false imprisonment counts had separate intents and objectives, but we can find no evidence to support the trial court's implied finding that the assault had an objective that was separate from both the robbery and the false imprisonment. The robbery was intended to obtain money and valuables. The false imprisonment was intended to prevent Rodriguez from identifying the robbers and from summoning assistance after they left. The light could not have been continuously shined in Rodriguez's eyes if he had not been tied up. Because the objective of the false imprisonment was distinct from the objective of the robbery, separate punishments could be imposed for these two counts. The same cannot be said with regard to the assault. The purpose of the assault was to overcome Rodriguez, who was struggling with one of the robbers, so that he could be tied up, thereby preventing him from interfering with the robbery, identifying the robbers, and summoning assistance after the robbers left. These objectives were the same as those underlying the robbery and the false imprisonment. We can find no evidence in the record to support a finding that the assault had some other separate objective. Accordingly, the trial court should have stayed the sentence for the assault count under section 654. We will direct it to do so on remand.

## IV.  Disposition

The judgment is reversed.  On remand, the trial court is directed to stay under section 654 the sentence imposed for the assault count and resentence defendant accordingly.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.